**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

---

Frank Foster et al.,

       Plaintiffs,

vs.

Nationwide Mutual Insurance Company,

       Defendant.

Court File No.: 2:08-cv-0020

JUDGE SARGUS

MAGISTRATE JUDGE PRESTON DEAVERS

---

**PLAINTIFFS' RESPONSE TO DEFENDANT NATIONWIDE'S POST-TRIAL BRIEF**

---

## TABLE OF CONTENTS

SUMMARY ....................................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ................................................................................................ 1

I.     NATIONWIDE BEARS THE BURDEN OF PROVING THE EXEMPTION'S APPLICABILITY, AND THE FLSA IS TO BE NARROWLY CONSTRUED AGAINST NATIONWIDE ........................................................................................... 2

II.    THE REMAINING FACTUAL ISSUE IS WHETHER SPECIAL INVESTIGATORS PROVIDED OPINIONS AND CONCLUSIONS ON FRAUD. ............................. 3

III.   THE RELEVANT AUTHORITY SUPPORTS A FINDING THAT INVESTIGATORS ARE NONEXEMPT ABSENT A RESPONSIBILITY FOR PROVIDING OPINIONS, RECOMMENDATIONS, OR CONCLUSIONS AS TO INVESTIGATORY FINDINGS ......................... 4

       A.     Special Investigators Were More Akin to the Investigators Found to be Nonexempt by the DOL and Other Courts. ..................................... 5

       B.     Neither the Regulations' Illustrative Factors, Nor Nationwide's Distinguishable Case Law, Further Advance the Court's Inquiry. ......................... 8

              1.     *The Court Should Disregard Nationwide's Inapplicable Case Law.* ....................................................................................... 8

              2.     *The Illustrative Factors Do Not Advance the Legal Analysis.* ................................................................................... 9

IV.    NATIONWIDE'S NEW "FINDING THE TRUTH" THEORY DOES NOT RESURRECT ITS CASE OR HELP IT PROVE ITS BURDEN. ....................................... 11

       A.     What Does "Finding the Truth" Mean? ................................................. 12

       B.     Special Investigators Do Not Serve As a Jury for the Claims Department .............................................................................................. 15

V.     THE COURT'S ANALYSIS REQUIRES A REVIEW OF THE "SIGNIFICANCE" OF THE DISCRETIONARY JOB DUTIES, NOT THE IMPORTANCE OF THE JOB FUNCTION. ............................................................................................... 16

       A.     Special Investigators Are Not Exempt by Association. .......................... 16

       B.     There is No "Subject-Matter Expert" Exemption to the FLSA. ........... 17

VI.    SPECIAL INVESTIGATORS' "PRIMARY DUTY" DID NOT INCLUDE DISCRETION AND INDEPENDENT JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE. ........................................................................................... 18

       A.     Secondary Duties Do Not Suffice to Satisfy the Exemption. ................ 18

i

B.      Un-required Tasks are Not Primary Duties. ...........................................19

        1.     *Nationwide's Discrete Examples of Special Investigators Providing "Opinions" on Whether Fraud Occurred are Unavailing and Do Not Establish Their Primary Duty.* ............................21

        2.     *A Once-in-a-Career Investigation Does Not Exemplify Special Investigators' Primary Duty.* ........................................23

C.      Remote Supervision Does Not Make Special Investigators Exempt....................24

D.      The Salary Comparison Between Special Investigators and Material Damage Appraisers Actually Supports a Finding that Plaintiffs are Nonexempt. .......................................................................25

E.      Every Work Task Is Not Swept Into the Primary Duty by the "Directly and Closely Related" Regulation. .........................................27

VII.    THE COURT SHOULD FIND IN FAVOR OF PLAINTIFFS AS TO THE REMAINING ISSUES.........................................................................................................28

CONCLUSION ........................................................................................................30

## SUMMARY OF CONTENTS

## PURSUANT TO LOCAL RULE 7.2

This Memorandum responds to Nationwide's post-trial brief, mainly arguing that the Court should rule according to the legal framework proposed at summary judgment, and either find Plaintiffs exempt nonexempt like the investigators in Dep't of Labor, FLSA2005-21, Op. Letter (Aug. 19, 2005), 2005 WL 3308592, or exempt like the claims adjusters in Roe-Midgett v. CC Servs., Inc., 512 F.3d 865 (7th Cir. 2008), by comparing and contrasting their job duties to the job duties of the employees in this case and opinion letter.

In Part I, pages 2–3, Plaintiffs clarify the burden of proof and rules of construction by relying predominately on Martin v. Ind. Mich. Power Co., 381 F.3d 574 (6th Cir. 2004).

In Part II, pages 3–4, Plaintiffs cite Pet'n of U.S. Steel Corp., 479 F.2d 489 (6th Cir. 1973), and request the Court apply the legal framework used in its order on summary judgment.

In Part III.A, pages 5–8, Plaintiffs cite the 2005 Opinion Letter, along with an abundance of case law for the proposition that investigators are nonexempt.  See Ahle v. Veracity Research Co., 738 F. Supp. 2d 896 (D. Minn. 2010); Fenton v. Farmers Ins. Exch., 663 F. Supp. 2d 718 (D. Minn. 2009); Gusdonovich v. Bus. Info. Co., 705 F. Supp. 262 (W.D. Pa. 1985).  In Part III.B, pages 8–11, Plaintiffs discuss the cases, opinion letters, and regulations relied upon by Nationwide in its post-trial brief, arguing they are distinguishable.

In Part IV, pages 11–16, Plaintiffs thoroughly explore Nationwide's assertion that the primary duty of Plaintiffs was to "find the truth," analyzing Nationwide's brief and the trial transcripts.

In Part V, pages 16–18, Plaintiffs explore Nationwide's arguments that Special Investigators specifically, and the SIU more generally, are important to Nationwide, and the legal

implications of such an argument.  Plaintiffs draw support from cases, such as <u>Clark v. J.M. Benson, Co., Inc.</u>, 789 F.2d 282 (4th Cir. 1986), <u>Ahle v. Veracity Research Co.</u>, 738 F. Supp. 2d 896 (D. Minn. 2010), and <u>Turner v. Human Genome Sci., Inc.</u>, 292 F. Supp. 2d 738 (D. Md. 2003).

In Part VI, pages 18–28, Plaintiffs address Nationwide's various arguments under regulation 29 U.S.C. § 541.700(a), regarding the primary duty of Special Investigators.

Subpart A addresses Nationwide's arguments regarding training and explains that "secondary" tasks do not affect the primary duty analysis.  Subpart B, argues that an un-required function cannot be a primary duty, relaying on <u>Reich v. Gateway Press, Inc.</u>, 13 F.3d 685 (3d Cir. 1994).  Subpart B also explores in depth the testimony that Nationwide heavily relies upon, making clear that the cited circumstances represent the exception and not the rule.  Subpart C makes clear that Special Investigators are indeed supervised and that "over-the-shoulder" supervision is not required for an employee to be nonexempt.  Subpart D addresses Nationwide's comparisons between the salaries paid to Special Investigators and the material damage appraisers, and the affect this comparison should have on the primary duty test.  Subpart E briefly discusses the meaning behind the "directly and closely related" provision of the regulations, 29 C.F.R. § 541.703(a), citing <u>Horrocks v. Daggett County</u>, 2006 WL 2598331 (D. Utah Sept. 11, 2006).

Finally, in Part VII, pages 28–30, Plaintiffs address Nationwide's good faith, willfulness, state law, and fluctuating workweek arguments, relying mostly on arguments Plaintiffs already made in their Closing Memorandum.

## <u>TABLE OF AUTHORITIES</u>

CASES

<u>Ahle v. Veracity Research Co.</u>, 738 F. Supp. 2d 896 (D. Minn. 2010) ...................... 5, 7-8, 14, 17

<u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680 (1946) .................................................. 29-30

<u>Auer v. Robbins</u>, 519 U.S. 452 (1997) ...........................................................................................6

<u>Clark v. J.M. Benson, Co., Inc.</u>, 789 F.2d 282 (4th Cir. 1986)......................................... 16-17, 24

<u>De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.</u>, 400 F.3d 72 (1st Cir. 2005) ...........................9

<u>Desmond v. PNGI Charles Town Gaming, L.L.C</u>, 564 F.3d 688 (4th Cir. 2009)...........................2

<u>Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.</u>, 204 F.3d 673 (6th
Cir. 2000) ...........................................................................................................................6

<u>Featsent v. City of Youngstown</u>, 70 F. 3d 900 (6th Cir. 1995) ....................................................28

<u>Fenton v. Farmers Ins. Exch.</u>, 663 F. Supp. 2d 718 (D. Minn. 2009).......................... 4, 6-8, 14, 19

<u>Fulwood-Kelley v. Cordis Corp.</u>, 2009 WL 5171752 (S.D. Fla. Dec. 22, 2009) .......................5, 7

<u>Gonzales v. City of Albuquerque</u>, 2011 WL 1114830 (D.N.M. Mar.23, 2011)..............................9

<u>Gusdonovich v. Bus. Info. Co.</u>, 705 F. Supp. 262 (W.D. Pa. 1985)...................................... 7-8, 24

<u>Herman v. Palo Grp. Foster Home, Inc.</u>, 183 F.3d 468 (6th Cir. 1999) ......................................29

<u>Hoge v. Honda of Am. Mfg., Inc.</u>, 2002 WL 1584274 (S.D. Ohio May 3, 2002).........................29

<u>Horrocks v. Daggett County</u>, 2006 WL 2598331 (D. Utah Sept. 11, 2006)..................................27

<u>Johnston v. Robert Bosch Tool Corp.</u>, 2008 WL 4534109 (W.D. Ky. Oct. 6, 2008).....................9

<u>Kennedy v. Commonwealth Edison</u>, 410 F.3d 365 (7th Cir. 2005) ...............................................8

<u>Martin v. Ind. Mich. Power Co.</u>, 381 F.3d 574 (6th Cir. 2004).................................................. 2-3

<u>Mullins v. Target Corp.</u>, 2011 WL 1399262 (N.D. Ill. Apr. 13, 2011) ..........................................5

<u>Murray v. Ohio Cas. Corp.</u>, 2005 WL 2372857 (S.D. Ohio Sept. 27, 2005) .................................5

<u>In re Novartis Wage & Hour Litig.</u>, 611 F.3d 141 (2d Cir. 2010)..................................................9

<u>O'Bryant v. City of Reading</u>, 197 F. App'x 134, 2006 WL 2034590 (3d Cir. 2006) ....................9

<u>Paul v. Petro. Equip. Tools Co.</u>, 708 F.2d 168 (5th Cir. 1983)......................................................9

Pet'n of U.S. Steel Corp., 479 F.2d 489 (6th Cir. 1973)...................................................................4

Pendergraft v. Fujitsu Network Commc'ns, Inc., No. 3:10-CV-2047, 2011 WL
3820384 (N.D. Tex. Aug. 26, 2011)..........................................................................................9

Piscione v. Ernst & Young, LLP, 171 F.3d 527 (7th Cir. 1999) ........................................9

Reich v. Gateway Press, Inc., 13 F.3d 685 (3d Cir. 1994) ..........................................19

Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997)........................................9

Robinson-Smith v. GEICO, 590 F.3d 886 (D.C. Cir. 2010)........................................5, 20

Roe-Midgett v. CC Servs., Inc., 512 F.3d 865 (7th Cir. 2008)................................ 4-5, 8

Roney v. United States, 790 F. Supp. 23 (D.D.C. 1992) .............................................17

Schaefer v. Ind. Mich. Power Co., 358 F.3d 394 (6th Cir. 2004)........................... 18-19

Spinden v. GS Roofing Prods. Co., Inc., 94 F.3d 421 (8th Cir. 1996) ...........................9

Turner v. Human Genome Sci., Inc., 292 F. Supp. 2d 738 (D. Md. 2003)....................17

Yi v. Sterling Collision, 480 F.3d 505 (7th Cir. 2007) .................................................2

## REGULATIONS

29 C.F.R. § 541.202 ........................................................................................8, 10, 16

29 C.F.R. § 541.203 ...................................................................................................5

29 C.F.R. § 541.700 ......................................................................................... 20, 24-25

29 C.F.R. § 541.703 .................................................................................................27

69 Fed. Reg. 22122 (Apr. 23, 2004) .................................................................. 5, 9, 16-17

## OTHER AUTHORITIES

Black's Law Dictionary (7th ed. 1999)......................................................................15

Dep't of Labor, FLSA2005-21, Op. Letter (Aug. 19, 2005), 2005 WL 3308592 ................ passim

Dep't of Labor, Op. Letter, No. FLSA2006-30 (Sept. 8, 2006), 2006 WL 2792444 ....................9

Merriam-Webster Dictionary, http://www.merriam-webster.com ................................11

## <u>INTRODUCTION</u>

Nationwide apparently would like to proceed as if this Court's summary judgment order was never issued.  That is how its arguments evolved during trial, and that is how its post-trial brief reads.  This change occurred because Nationwide knew it could not deliver at trial what it promised at summary judgment:  a showing that the Special Investigators' primary duty included giving opinions as to fraud and recommendations as to claims disposition.  In fact, Nationwide wholly admitted at trial that Special Investigators were not to "opine . . . on whether a claim should be paid or denied," because a "separation of powers" existed between SIU and the claims department.  Nationwide also admitted that Special Investigators were not to use the "F word" because a determination of whether fraud occurred was for judge and jury.  After this, Nationwide is left to cite only rare investigations in which Plaintiffs offered opinions in violation of the policies expressed in company documents and espoused by Nationwide's own witnesses.  This is not sufficient to satisfy its burden.

Upon admitting a lack of discretion as to the two job tasks deemed most significant by the Court's summary judgment order, Nationwide desperately refocuses the issue into a far more sweeping, vague, and language-challenged question of whether Special Investigators use discretion, throughout the investigation, with the goal of finding the "TRUTH."  Nationwide establishes Special Investigators' goal of finding the "truth" by citing tasks that the Department of Labor ("DOL") has specifically found do not rise to the level of significance necessary under the exemption.  Nationwide does not offer a legitimate reason why this Court should ignore the DOL's guidance, and does not distinguish its Special Investigators from the many investigators found to be nonexempt by courts acting in concert with the DOL's opinion letter.  Instead, Nationwide attempts to recreate the standard by citing a number of cases that apply the

1

administrative exemption to different jobs in different circumstances.  Nationwide should not be permitted to redefine post-trial the legal issue presented for factual resolution.

Aside from redefining the legal issues, Nationwide also suggests that this job is too "important," "high paying," "independent," "complex, high-level, interesting, diverse, and challenging" to qualify for overtime.  While such creative language may be persuasive to persons unfamiliar with the FLSA, it does not aid Nationwide in meeting its burden under the applicable legal framework and should therefore be disregarded.

For these and the other reasons stated below, Nationwide failed to meet its burden as to this narrowly construed exemption to the overtime law, and Plaintiffs are entitled to the judgment they seek.

## I) NATIONWIDE BEARS THE BURDEN OF PROVING THE EXEMPTION'S APPLICABILITY, AND THE FLSA IS TO BE NARROWLY CONSTRUED AGAINST NATIONWIDE.

It is well settled that exemptions to the FLSA's overtime provisions are to be narrowly construed against the employers seeking to assert them.  Martin v. Ind. Mich. Power Co., 381 F.3d 574, 578 (6th Cir. 2004).  It is also well settled and undisputed that Nationwide bears the burden of proving that Plaintiffs are exempt under the "preponderance of evidence" standard.  Id.; (Order 9, ECF No. 84.)  In an attempt to diminish these established principals, Nationwide cites a Seventh Circuit case, Yi v. Sterling Collision, which inappropriately conflates statutory construction with burden, providing that "the principle of narrow interpretation of exemptions is a tie breaker."  480 F.3d 505, 508 (7th Cir. 2007).  Another circuit court has explicitly rejected Yi, holding that "[e]mployers must prove by *clear and convincing evidence* that an employee qualifies for [an] exemption [under the FLSA]."  Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 691 n.3 (4th Cir. 2009) (citation omitted) (emphasis added).

The Sixth Circuit has adopted neither the Seventh Circuit's convoluted "tie-breaker"

2

construal of an employer's burden under the FLSA, nor the Fourth Circuit's elevated "clear and convincing" burden of proof. Rather, the Sixth Circuit has continued to apply both burden and statutory construction standards in tandem without conflating the two principles: courts must construe an employer's asserted exemption narrowly and against the employer, and the employer must prove exemption status under the preponderance of evidence standard. Martin, 381 F.3d at 578; (Order 9, ECF No. 84.) The Court, therefore, should reject Nationwide's invitation to diminish the established statutory construction concepts under the FLSA.

## II) THE REMAINING FACTUAL ISSUE IS WHETHER SPECIAL INVESTIGATORS PROVIDED OPINIONS AND CONCLUSIONS ON FRAUD.

In its summary judgment motion, Nationwide argued many of the same points that it now makes in its post-trial brief. Nationwide emphasized that Special Investigators developed action plans and decided which leads to follow, which questions to ask in an interview, the order upon which to conduct investigatory activities, which facts to document, whether to recommend a third-party vendor, whether to recommend an EUO (and in some cases conducted them), and whether to refer a claim to law enforcement (hereafter "investigatory activities"). (Compare Def.'s Summ. J. Mem. 11–16, ECF No. 77-2, with Def.'s Post-Trial Br. 3, 21, 29, ECF No. 196.)[1] The record relating to these activities remained unchanged, albeit it became a bit more verbose, from summary judgment to trial.

At summary judgment, the Court found the above-cited tasks unpersuasive under the applicable law, emphasizing instead the factual dispute surrounding whether Special Investigators provided opinions and recommendations as to claims disposition and as to fraud.

---

[1] Despite the striking similarities between Nationwide's post-trial brief and summary judgment memorandums, Nationwide retreated from its summary judgment arguments in a meaningful way; it no longer asserts that Special Investigators provide opinions and recommendations on claims dispositions, likely because its witnesses testified that giving such opinions "crosses the line" between investigating and adjusting. (Compare Def.'s Post-Trial Br., with Def.'s Resp. to Pls.' Summ. J. Mot. 9–10, ECF No. 80 ("Plaintiffs opine whether a claim is legitimate or fraudulent and provide detailed recommendations on whether a claim should be paid or denied.").)

(See Order 22, ECF No. 84.) Unable to satisfy its burden at trial on this most significant question, Nationwide now asks the Court to reconsider the importance of Special Investigators' investigatory activities and to wholly ignore relevant authority. In so asking, Nationwide has not presented any new evidence that would necessitate such reconsideration. Nationwide simply asks the Court to change its mind. No cogent reason, however, exists to warrant either a retreat from the Court's previous analysis or an abandonment of previously cited precedent. The Court should accordingly decline Nationwide's invitation to do so. See Pet'n of U.S. Steel Corp., 479 F.2d 489, 494 (6th Cir. 1973) (noting that courts should only deviate from their prior rulings when they find "some cogent reason to show the prior ruling is no longer applicable").

III) **THE RELEVANT AUTHORITY SUPPORTS A FINDING THAT INVESTIGATORS ARE NONEXEMPT ABSENT A RESPONSIBILITY FOR PROVIDING OPINIONS, RECOMMENDATIONS, OR CONCLUSIONS AS TO INVESTIGATORY FINDINGS.**

In highlighting investigatory activities once again, Nationwide engages in an expansive legal analysis—despite the Court's request that the parties focus their post-trial memoranda on the facts. Nationwide relies on distinguishable case law and emphasizes the regulation's illustrative ten factors, all while wholly ignoring the most factually relevant legal precedent and the framework set forth in the Court's summary judgment order. The Court should reject Nationwide's attempt to redefine the legal analysis and should instead answer the question that it posed at summary judgment: whether Special Investigators operated more like claims adjusters, such as those in Roe-Midgett v. CC Services Inc., 512 F.3d 865 (7th Cir. 2008), or like investigators—such as those analyzed in the Dep't of Labor, FLSA2005-21, Op. Letter (Aug. 19, 2005), 2005 WL 3308592 [hereafter "2005 Opinion Letter"], and in Fenton v. Farmers Insurance Exchange, 663 F. Supp. 2d 718 (D. Minn. 2009)—to decide whether Nationwide met its burden. The evidence revealed at trial, and cited at length in Plaintiffs' closing trial memorandum, should

all assist the Court in concluding that Plaintiffs were nonexempt Special Investigators.

### A) Special Investigators Were More Akin to the Investigators Found to be Nonexempt by the DOL and Other Courts.

According to the claims-adjuster cases cited by Nationwide, claims adjusters typically have a few significant responsibilities in common:  they "decide whether to repair or replace parts, negotiate . . . , and settle claims."  Roe-Midgett, 512 F.3d at 875; see also 29 C.F.R. § 541.203(a); Robinson-Smith v. GEICO, 590 F.3d 886, 894–95 (D.C. Cir. 2010); Murray v. Ohio Cas. Corp., No. 2:04-cv-539, 2005 WL 2373857, at *8 (S.D. Ohio Sept. 27, 2005).  In fact, it is "[t]he core function of a claims adjuster . . . to decide whether and to what extent an insurance claim should be paid, a task that requires considerable exercise of discretion on a matter of significance."  Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 908 (D. Minn. 2010).

Investigators, on the other hand, are consistently found to be _nonexempt_ even if "their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met."  29 C.F.R. § 541.203(j); see also 69 Fed. Reg. 22122, 22147 (Apr. 23, 2004) ("The examples [in section 541.203(j)] are straightforward and drawn from previous Wage and Hour opinion letters in which, based on the facts presented, the work involved was considered to be based on the employee's use of skills and technical abilities, rather than exercising the requisite discretion and independent judgment specified in the regulations.").[2]  More specifically, investigators can be nonexempt even when

---

[2] Nationwide cites two cases with employees who held "investigator"-type positions.  But, unlike the investigators in the cases cited by Plaintiffs infra, these employees maintained significant discretion with respect to decisions made after the conclusion of the investigations, and thus are more akin to claims adjusters.  See Mullins v. Target Corp., No. 09 C 7573, 2011 WL 1399262, at *6–7 (N.D. Ill. Apr. 13, 2011) (finding "loss prevention investigator" exempt when she decided when to initiate an investigation, who investigates it, when to close an investigation, and most importantly, "she presented her subjective views to her supervisor"—in fact, the loss prevention investigators were "_expected_ to express opinions"); Fulwood-Kelley v. Cordis Corp., No. 09-20920-CIV, 2009 WL 5171752, at *9–11 (S.D. Fla. Dec. 22, 2009) (finding exempt the complaint handling specialists for a medical device manufacturer, who

they "schedule," "prioritize," "assess," and "follow" leads; assess credibility; determine and resolve "discrepancies" and "inconsistencies;" "strike a balance between contacting a sufficient number of sources in order to get a complete picture of a subject's life and committing investigative over-kill;" and then "assemble all investigative leads into a complete" report for the DSS "to determine whether to grant or deny the subject of the background investigation access to classified information."  2005 Opinion Letter at *1–2, 6.  Such activities, according to the DOL, are not matters of significance.[3]  Id. at *6.

  The court in Fenton adopted the 2005 Opinion Letter and found special investigators for the defendant insurance company were likewise nonexempt.  This Court found Fenton distinguishable because there was no dispute between the parties that Farmers' special investigators were not permitted to provide opinions and recommendations in their written reports.  (Order 23–24, ECF No. 84.)  Now that this case has been tried, and a more complete factual record has developed, it is clear that Farmers' special investigators are _factually indistinguishable_ in their job tasks from Nationwide's Special Investigators: they contact a claims representative upon referral, develop action plans, take photographs, retrieve reports or records, interview witnesses, report suspected insurance fraud to the state, recommend use of a vendor, request permission from the claims representative to close an investigation, and submit "an exhaustive file of their research materials, including 'a list of all completed tasks (or an explanation of why a task was not completed), a report of any inconsistencies, discrepancies, and/or significant findings (both inculpating and exculpating); [and] a complete summary of the

---

decided when to investigate complaints and when to close investigations, negotiated settlements with customers, and after the completion of an investigation, analyzed the facts and made coding and reportability determinations).

[3]  As the Court noted in its summary judgment order, "[t]he DOL's interpretation of its own regulations are controlling unless plainly erroneous or inconsistent with the regulation."  (Order 21, ECF No. 84 (citing Auer v. Robbins, 519 U.S. 452, 462 (1997)); see also Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc., 204 F.3d 673, 677 (6th Cir. 2000) ("[T]he written opinions of the Administrator or his deputies constitute the most reliable interpretations of the Department's regulations.").

entire investigation.'" <u>Fenton</u>, 663 F. Supp. at 722–23 (internal citations omitted).[4]  Most significantly, the court in <u>Fenton</u> recognized that "special investigators determine credibility and occasionally share their impressions informally with claims representatives," and still found them to be nonexempt.  <u>Id.</u>

The <u>Fenton</u> court cited as support <u>Gusdonovich v. Business Information Co.</u>, which similarly involved insurance-claims investigators.  705 F. Supp. 262, 263 (W.D. Pa. 1985) ("Such investigation included the search of public records, the serving of subpoenas and orders, surveillance, the interrogation of witnesses, and additional duties arising in the course of and subsequent to such investigations.").  The court in <u>Gusdonovich</u> also granted summary judgment in favor of the plaintiff, finding "investigators were merely applying their knowledge and skill in determining what procedure to follow, which . . . is not the exercise of discretion and independent judgment contemplated by the regulation."  <u>Id.</u>

Since this Court ruled on summary judgment, another case, <u>Ahle v. Veracity Research Co.</u>, adopted the 2005 Opinion Letter in finding claims investigators to be nonexempt.  738 F. Supp. 2d 896, 907 (D. Minn. 2010) ("Admittedly, claims investigators do make decisions regarding the precise manner in which they conduct an investigation—creating action plans, deciding who to interview, what documents to review, what leads to follow, and whether to recommend hiring an expert—however, such decisions . . . do not amount to the exercise of discretion and independent judgment with respect to matters of significance.").[5]  Like the court

---

[4] Notably, the court in <u>Fulwood-Kelley</u>, a case cited by Nationwide, distinguished its complaint handling specialists from other types of investigators on the grounds this Court has deemed significant: "[U]unlike Plaintiffs, the employees in the [2005] Opinion Letter and <u>Fenton</u> merely investigated and provided factual reports so that other employees could make a decision—they did not analyze the facts and determine what course of action the employer should take."  2009 WL 5171752, at *11 (citations omitted).  <u>Fulwood-Kelley</u> is therefore distinguishable from this case on these grounds.

[5] The court in <u>Ahle</u> actually distinguished the defendant's "claims investigators" from Nationwide's Special Investigators in its review of this Court's summary judgment order: "[Unlike in <u>Foster</u>,] claims investigators do not provide opinions and conclusions about their investigative observations."  <u>Id.</u> at 907 n.3.

in <u>Fenton</u>, the <u>Ahle</u> held that "occasionally convey[ing] . . . subjective opinions or conclusions regarding the credibility of the individual they interview," is not significant enough to satisfy the exemption.  <u>Id.</u> at 907 n.3.

  <u>Ahle</u>, along with <u>Fenton</u>, <u>Gusdonovich</u>, and the 2005 Opinion Letter, all make clear that the determinative issue upon which the administrative exemption turns is whether, at the end of the investigation, investigators make recommendations and opinions on whether to pay or deny a claim and/or whether a claim is legitimate.  This is, indeed, the primary difference between adjustors and investigators—the difference between <u>Roe-Midgett</u> and the 2005 Opinion Letter— and the answer to this question means the difference between exempt and nonexempt.  The use of non-significant investigatory discretion, on the other hand, does not trigger the exemption.  Under this framework, the "discretion" noted in Nationwide's post-trial brief is inapplicable to the ultimate exemption determination.

  **B)**  **Neither the Regulations' Illustrative Factors, Nor Nationwide's Distinguishable Case Law, Further Advance the Court's Inquiry.**

  Ignoring the Court's previous analysis and the above-presented applicable law, Nationwide attempts to fashion an exemption from scratch, drawing on the factors espoused in section 541.202(b) of the regulations (which the DOL compiled and enacted prior to the 2005 Opinion Letter) and a plethora of clearly distinguishable case law.  This unpersuasive authority does not further advance the legal analysis and should be disregarded.

  **1)**  <u>**The Court Should Disregard Nationwide's Inapplicable Case Law.**</u>

  Nationwide cites numerous inapplicable cases, addressing unrelated job positions out-of-context.  <u>See</u> <u>Kennedy v. Commonwealth Edison</u>, 410 F.3d 365, 375 (7th Cir. 2005) ("**Lead work planners and first line supervisors** are in routine contact with upper management, making recommendations about projects, schedules, and personnel." (emphasis added));

O'Bryant v. City of Reading, 197 F. App'x 134, 2006 WL 2034590 (3d Cir. 2006) (**human relations commission administrator**); De Jesus-Rentas v. Baxter Pharmacy Servs. Corp., 400 F.3d 72 (1st Cir. 2005) (**compound pharmacists**)*;* Piscione v. Ernst & Young, LLP, 171 F.3d 527 (7th Cir. 1999) (finding an **accountant** exempt who, according to his deposition, "[d]emonstrates that he helped to improve client services, acted as a supervisor for several employees, and was responsible for several clients"); Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997) (**marketing representatives**); Spinden v. GS Roofing Prods. Co., Inc., 94 F.3d 421 (8th Cir. 1996) (**controller**); Paul v. Petro. Equip. Tools Co., 708 F.2d 168 (5th Cir. 1983) (**airline pilots**); Pendergraft v. Fujitsu Network Commc'ns, Inc., No. 3:10-CV-2047, 2011 WL 3820384, at *1 (N.D. Tex. Aug. 26, 2011) (**corporate account administrator**); Gonzales v. City of Albuquerque, No. 09-0520, 2011 WL 1114830 (D.N.M. Mar. 23, 2011) (**supervisors**); Johnston v. Robert Bosch Tool Corp., No. 08-CV-33, 2008 WL 4534109 (W.D. Ky. Oct. 6, 2008) (**environmental coordinator/plan engineer** examined under state law); Dep't of Labor, Op. Letter, No. FLSA2006-30 (Sept. 8, 2006), 2006 WL 2792444 (analyzing **loss prevention managers**, who 1) developed store-specific programs, 2) allocated department resources, 3) conducted audits, 4) developed training, and 5) developed cash shortage controls and programs). The Court should disregard these cases as distinguishable and contrary to the more factually-relevant authority outlined above.

<strong>2)      <u>The Illustrative Factors Do Not Advance the Legal Analysis.</u></strong>

Nationwide also relies on several of the factors found in the regulations.  These factors are merely "illustrative," and a case-by-case exemption analysis is still required.  In re Novartis Wage & Hour Litig., 611 F.3d 141 (2d Cir. 2010) (referring to the ten-factor list as "illustrative"); 69 Fed. Reg. at 22143 ("[A] case-by-case analysis is required.").

For starters, Nationwide cites one factor to argue that investigators have the "*authority* to

9

waive or deviate from established policies and procedures without prior approval."  29 C.F.R. § 541.202(b) (emphasis added).  Nationwide rationalizes this position by citing Plaintiffs' testimony that they gave opinions occasionally and without consequence.  (Def.'s Post-Trial Br. 38.)  Nationwide, of course, does not establish that Special Investigators were "authorized" to do so, and it cannot.  There is nothing in the record to suggest Plaintiffs were expressly permitted to deviate from Nationwide's "Best Practices" guide, File Review Questionnaires, File Conference Review Procedures, SIU handbook, managerial direction, or its bright-line "separation of powers" policy.  In fact, some Plaintiffs testified they were reprimanded when they deviated from these directives.  (Tr. vol. 3, 51:20–52:16 (W. Jacobs); Rider Dep. 258:7–17; see also Pls.' Ex. 627 at 1.)  Without any evidence in the record to support the claim that Special Investigators were "authorized" to ignore company policy, Nationwide cannot satisfy its burden on the applicability of this illustrative factor.

Nationwide, moreover, argues that Special Investigators "provide[] consultation or expert advice *to management*," "investigate and resolve matters of significance *on behalf of management*," and carry "out major assignments in conducting the operations of the business." 29 C.F.R. § 541.202(b).  Nationwide's citation of these factors is disingenuous for two primary reasons.  First, and most obviously, Special Investigators do not provide their investigatory findings to "management,"—and they certainly do not do so on management's *behalf*.  While management may on occasion review the claims logs or participate in a file conference, Special Investigators conduct investigations and report the facts they learn to their "partners," the claims adjusters.  (Tr. vol. 6, 170:13–16 (A. Marakovits).)[6]

---

[6] Nationwide cites these factors to highlight the importance of the minimal training and missed opportunity reviews conducted by Special Investigators.  These tasks, however, were not primary duties, infra Part VI.A.  Regardless, investigators did not provide training to management or on behalf of management, so these tasks do not satisfy these illustrative factors.

Second, Special Investigators do not "resolve" significant matters or provide advice.  To "advise," means to "to give (someone) a recommendation about what should be done." Merriam-Webster Dictionary, available at http://www.merriam-webster.com (last visited Oct. 13, 2011).  The parties agree that Special Investigators abstain from advising on how to pay or deny a claim, (See Pls.' Closing Mem. 12–15, ECF No. 195 (citing testimony)), and it is the claims adjusters who "resolve" significant matters—not Special Investigators.  (See Tr. vol. 6, 40:22–41:23.)

Putting aside their inapplicability, these factors do not advance the Court's analysis any further than the authority already cited in the Court's summary judgment order.  For example, the illustrations reference "major assignments" and "matters of significance," which begs the question: what is legally significant?  Without this answer, the illustrative factors add nothing to the relevant analysis.  The Court must still consider the DOL's further guidance and related case law to determine what is "major" or "significant" in the context of investigations.  That guidance informs the Court that applicable opinions, recommendations, and conclusions as to claims legitimacy and disposition qualify as "major" or "significant."  Thus, these illustrative factors themselves do not provide any additional insight.

## IV) NATIONWIDE'S NEW "FINDING THE TRUTH" THEORY DOES NOT RESURRECT ITS CASE OR HELP IT PROVE ITS BURDEN.

Nationwide's witnesses have (1) admitted that making recommendations as to claims dispositions is not a Special Investigator's primary duty, (e.g., Tr. vol. 5, 242:13–15 (L. Herman)), and (2) established that opinions about whether fraud occurred should not be in the written logs, (e.g., Tr. vol. 6, 215:22–25, 217:3–11 (A. Marakovits) ("My training and experience has taught me not [to put opinions in writing] . . . [and] I'm very careful [to put only facts] in the logs")).  As a consequence, Nationwide's brief exclusively focuses on the vague, yet

facially provocative phrase—"to find the truth"—to describe the goal of Plaintiffs' investigations, and according to Nationwide, Plaintiffs' primary duty. (Def.'s Post-Trial Br. 13, 34.)  When stripped to the bone, it becomes clear that this ambiguous phrase does not help Nationwide establish its affirmative defense.

### A)      What Does "Finding the Truth" Mean?

It is difficult to grasp what Nationwide actually means when it contends that Plaintiffs' primary duty as Special Investigators is to "find the truth."  Nationwide's definition is a moving target:

| EXCERPTS FROM NATIONWIDE'S BRIEF: | WHAT "FINDING THE TRUTH" MEANS TO NATIONWIDE: |
| --- | --- |
| Special Investigators "make factual findings of **what they determine to be the truth** of what happened on a claim."  (<u>Id.</u> at 2 (emphasis added).) | What happened on a claim |
| "In order to make findings of fact, Special Investigators necessarily exercise independent judgment to differentiate between what's relevant from irrelevant, what's consistent from what's inconsistent, what's corroborated from uncorroborated, who was deceptive and who was not and, at the end of the day, **what's true from what's not**."  (<u>Id.</u> at 3 (emphasis added).) | <ul><li>What's relevant from irrelevant</li><li>What's consistent from what's inconsistent</li><li>What's corroborated from uncorroborated</li><li>Who was deceptive and who was not[7]</li></ul> |
| "[SIU] investigat[es] the red flags (a/k/a validating the claim, a/k/a resolving the suspicion, **a/k/a finding out the truth as to what happened**, a/k/a making findings of fact) . . . ."  (<u>Id.</u> at 12 (emphasis added).) | <ul><li>Validating the claim</li><li>Resolving the suspicion</li><li>Making findings of fact</li><li>Finding out the truth as to what happened</li></ul> |
| "The ultimate goal of the investigation **is to find out the truth** about the claim to help claims make a coverage decision.  In other words, the claims representative is looking to the Special Investigators for their expertise, their findings, and a determination of whether or not the person did or did not commit fraud."  (<u>Id.</u> at 13 (emphasis added).) | Whether or not the person did or did not commit fraud |
| Plaintiffs' [admit] that their job **is to find out the truth** . | Giving the claims adjuster facts that |

---

[7] The 2005 Opinion Letter provides that all of these tasks do not amount to "matters of significance."  <u>See</u> 2005 Opinion Letter at *2.

| | |
|---|---|
| . . Plaintiff Short admitted that "you give him the facts in context" and show him "here [are] your discrepancies." (Id. at 18 (emphasis added).) | show discrepancies |
| "Plaintiffs' . . .**job is to find the truth** and that they communicated what they believed the truth to be to the claims representative . . . . In order to arrive at the truth, and whether the truth is called a fact, an opinion, a conclusion, a recommendation or a determination, Special Investigators had to make judgment calls day in and day out on matters of significance—whether the claims they were investigating were legitimate or fraudulent."  (Id. at 34 (emphasis added).) | Whether the claims they were investigating were legitimate or fraudulent |

Plagued with these definitional challenges, Nationwide attempts to prove its case by contorting Plaintiffs' testimony into something it is not.  For example, Nationwide argues that the goal of "finding the truth" was evidenced by Plaintiff Tommy Short's testimony, explaining that "you give [the adjuster] the facts in context" and show him "here [are] your discrepancies." (Id. at 18.)[8]  But as this example demonstrates, Special Investigators did not act as judge or jury and determine what actually happened or whether fraud occurred—Special Investigators simply gave the information to the claims adjusters who made the significant determinations on the file. Plaintiff Foster gave a prime example of his job duties when testifying upon the Court's inquiry: if he interviewed an insured who told one story, and interviewed three other witnesses who gave other versions of the story, Plaintiff Foster would provide all four statements to the claims adjuster, but not opine about the discrepancies.[9]  (Tr. vol. 4, 22:2–23:10.)  This was the "truth" as he uncovered it, but he did not weigh the evidence or conclude which version of the truth was most believable.

---

[8] Nationwide also claims that Plaintiff Short testified that his "job is to find out if those indicators are valid." (Def.'s Post-Trial Br. 14.)   Directly after the cited testimony, which Nationwide failed to include, Plaintiff Short explains how he finds out if indicators are valid:  "The action plan beneath it.  I go out and talk to people, look at the car, do database checks on the car, on the person, on the insured, talk to the police department . . .  I communicate what I found, the facts," not by communicating an opinion.  (Tr. vol. 2, 52:12–23.)

[9] Plaintiff Foster also testified that during the course of an investigation, the facts he gathers can render the truth obvious, but can also make the truth less clear, and in the case of the latter, it is not his primary duty to provide opinions about the truth.  (Tr. vol. 4, 135:21–136:16.)

More important, Nationwide's amorphous "finding the truth" theory fails because the goal in *any* investigation should be to do just that.  If attempting to "find the truth" were enough to satisfy the administrative exemption test, then every investigator position in this country would be exempt.  After all, what is the purpose of an investigation?  What does it mean to investigate?  The investigators who were the subject of the 2005 Opinion Letter were charged with investigating the backgrounds of applicants, information "critical for DSS to determine an individual's eligibility for access to classified information and/or assignment to, or retention in, positions with sensitive duties."  2005 Opinion Letter at *1.  In Nationwide's parlance, these investigators were charged with "finding the truth" about the applicants' background.  Likewise, in <u>Fenton,</u> Farmers "employ[ed] special investigators who investigate potentially fraudulent insurance claims." 663 F. Supp. 2d at 721.  Adopting Nationwide's definition, the primary duty of Farmers' special investigators should have been to find the truth, and they were still deemed nonexempt under the administrative exemption.  In <u>Ahle</u>, the investigators (also found to be nonexempt) conducted investigations on suspect claims performing surveillance, undercover investigations, background checks, interviewing witnesses, obtaining statements and taking photographs.  738 F. Supp. 2d at 900.  Again, following Nationwide's jargon, the job of the investigators in <u>Ahle</u>, too, was to "find the truth."

Knowing it cannot meet its burden to demonstrate Special Investigators provided opinions as to whether fraud occurred—the matter of significance at issue in this case—Nationwide blurs and transforms a straight forward factual issue into a semantics game, where "finding the truth" means to "provide an opinion and recommendations," and much much more as the above chart illustrates.  The Court should reject Nationwide's desperate extension of the administrative exemption.

**B)**     **Special Investigators Do Not Serve As a Jury for the Claims Department.**

Nationwide makes another play on words by comparing a Special Investigator's primary duty of finding facts with a jury's role (or the Court in this case) of "fact finding."  Nationwide goes so far as to cite to Black's Legal Dictionary for the _legal_ definition of "finding of fact," which according to Nationwide, is "the equivalent of making a judgment, a verdict, a ruling, a result, a sentence, a pronouncement, a determination, a conclusion, a decision."  (Def.'s Post-Trial Br. 2–3.)

Certainly, Special Investigators did not serve as a jury during their investigations.  See Black's Law Dictionary 860 (7th ed. 1999) (defining "jury" as "a group of persons . . . given the power to decide questions of fact and return a verdict in the case submitted to them.").  Special Investigators did not have the power to make decisions about whether fraud occurred and were, in fact, trained _not_ to provide such determinations because of bad-faith litigation concerns.  (See Tr. vol. 6, 215:22–25, 217:3–11 (A. Marakovits).")) Ms. Brady recognized that Special Investigators _could not_ make a determination of fraud because "that would have to be determined by a court of law."  (Tr. vol. 5, 19:10–15.)    Nevertheless, Nationwide argues that Special Investigators do just that—serve a jury function and determine whether fraud occurred.

In reality, it was the claims adjusters' job to serve as the jury—to weigh the facts collected by the Special Investigator and determine how the evidence affects the ultimate claims decision.  (Tr. vol. 2, 21:1–23:5, 24:9–20, 35:1–13 (T. Short).)  At times, claims adjusters even made decisions on the disposition of the claim irrespective of the facts gathered by the Special Investigators.  (Tr. vol. 7, 124:19–125:10 (R. Schmidt).)  Claims adjusters looked to Special Investigators to describe the first-hand personal knowledge they obtained by talking to witnesses, observing the scene, and inspecting the loss.  (See Tr. vol. 2, 140:17–141:10 (T. Short).) While this process qualifies as "fact finding" in parochial terms, investigators were not making

15

conclusions, or "findings of fact" as Nationwide defines it.  Thus, the Court should disregard this

inapplicable analogy.

**V)      THE COURT'S ANALYSIS REQUIRES A REVIEW OF THE "SIGNIFICANCE"
         OF THE DISCRETIONARY JOB DUTIES, NOT THE IMPORTANCE OF THE
         JOB FUNCTION.**

      **A)      Special Investigators Are Not Exempt by Association.**

Apart from relying on its "truth" arguments, Nationwide's post-trial brief highlights the

importance of Special Investigators by emphasizing their role within a larger scheme, by arguing

the following:  Nationwide deems Special Investigators to be important to the SIU department,

which is itself material in the fight against fraud, which is vital to the claims organization, which

is ultimately essential to the company at large.  In other words, the SIU department is a "special"

and "elite operation" (filled with "cache and drama"), that is on the "cutting edge" of fraud

prevention.  (Def.'s Post-Trial Br. 4–5, 9–12.)  The claims organization, in turn, relies on this

"special" department to ensure successful operation of the claims process, which "will ultimately

have an obvious and significant impact on the discharge of Nationwide's contractual duties to its

policyholders."  (Id. at 4.)  By emphasizing the significance of the claims function, and the role

of the SIU within that process, Nationwide argues exemption by "domino effect."

Taking Nationwide's logic to the extreme, every employee who works for an "essential

department," or whose job impacts a matter of significance (no matter how minute), could

potentially be exempt.  This is not the law.  The Court must examine the "*nature* of the work, not

its ultimate consequences."  Clark v. J.M. Benson, Co., Inc., 789 F.2d 282, 287 (4th Cir. 1986)

("But while Clark may have held an indispensable position . . . this fact is insufficient to prove

that her primary duty was administrative as a matter of law."); see also 29 C.F.R. § 541.202

("[A] messenger who is entrusted with carrying large sums of money does not exercise discretion

and independent judgment with respect to matters of significance even though serious

consequences may flow from the employee's neglect."); 69 Fed. Reg. at 22142.  Further, the Court must ask whether the discretion identified is "*with respect to* a matter of significance," not whether it "*impacts or affects* a matter of significance."  <u>Ahle</u>, 738 F. Supp. 2d at 908 ("If the rule were otherwise, all employees would arguably meet the third element of the definition of administrative employees"); <u>see also</u> <u>Roney v. United States</u>, 790 F. Supp. 23, 28 (D.D.C. 1992) ("[I]f the Court should find, as the defendant argues, that the plaintiff's duties and responsibilities as described, are administrative and that they significantly affect the policies and programs, . . . the administration of justice, the exemption would swallow the rule.  In fact, it would be difficult to isolate a law enforcement officer or public safety official who would be covered by the FLSA.").  Thus, the importance of the department, the mission, and the process, do not advance the third-prong analysis of the administrative exemption.

### B)     There is No "Subject-Matter Expert" Exemption to the FLSA.

When describing the Special Investigator position specifically, Nationwide argues that the job is not "mundane or rote," but rather, is "complex, high-level, interesting, diverse, and challenging."  (Def.'s Post-Trial Br. 11.)  Yet, Nationwide's perception of the Special Investigators' utility is also not relevant to the test.  It is, in fact, "possible that an employee's job can be viewed as 'indispensable' and still not reach the degree of 'substantial importance' necessary" under the exemption.  <u>Turner v. Human Genome Sci., Inc.</u>, 292 F. Supp. 2d 738, 745 (D. Md. 2003) (citing <u>Clark</u>, 789 F.2d at 287).  Every employee, after all, contributes something essential, and "each and every position in an organization is one of responsibility . . . ."  69 Fed. Reg. at 22138 (quoting the Society for Human Resource Management) ("[A] basic tenet of modern management philosophy is empowering employees to see their position in an organization, whatever it might be, as one of responsibility. This is true whether the position held is receptionist or customer service agent." (quoting the Workplace Practices Group)).

Plaintiffs recognize that Nationwide holds its Special Investigators in high regard, but this fact does not advance the Court's analysis of the "nature of" Special Investigators' duties. After all, there is no stand-alone "importance" exemption, nor is there a "complex, high-level, interesting, diverse and challenging" exemption. Such descriptors compose a legally irrelevant argument and should appropriately be disregarded by the Court.

## VI) SPECIAL INVESTIGATORS' "PRIMARY DUTY" DID NOT INCLUDE DISCRETION AND INDEPENDENT JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE.

To satisfy the third prong of the administrative exemption test, Nationwide must prove that Plaintiffs' _primary_ duty _included_ the exercise of discretion and independent judgment with respect to matters of significance. To get here, Nationwide cites tasks that do not rise to the level of primary and inaccurately applies the regulations. A true application of the facts presented at trial to the appropriate law reveals that Plaintiffs' primary duty did not include the requisite discretion as to significant matters.

### A) Secondary Duties Do Not Suffice to Satisfy the Exemption.

When determining whether a task is encompassed by the employees' primary duty, the Court must look at how it relates to the primary job function itself, as opposed to some other secondary function. Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 406 (6th Cir. 2004) ("We need not consider whether [the plaintiff] exercises discretion when completing secondary tasks." (citation omitted)). Otherwise, "if we were to accept [defendant's] contention, then _any_ minimal amount of discretion would satisfy this prong and nonexempt employees given as examples in the regulations, such as bank tellers and book keepers, would potentially be swept into the exemption upon performance of an occasional discretionary task." Id. at 404.

Nationwide relies strongly on training-duties and missed opportunity reviews in arguing its case, but the record reveals that these were, at best, secondary tasks that investigators

conducted on an "as needed" basis.  (Pls.' Closing Mem. 37–38.)  First, Nationwide set forth very little information about missed opportunity reviews at trial.  Ms. Cobb and Plaintiff Rider—both of whom have prior claims backgrounds—were the only investigators who testified to conducting these reviews.  Second, Nationwide did not hire investigators for the purpose of training; it hired them to investigate suspicious claims, and the testifying Plaintiffs trained very infrequently.  (Id.)  In fact, SIU used this training in part as a marketing tool to increase SIU's exposure to claims personnel, and ultimately to increase investigation referrals.  (See Tr. vol. 7, 200:13–16.)  Training was such a small part of a Special Investigator's duties that Mr. Wickre did not believe that training was part of their MBOs, although it could have been at some point. (Id. at 199:16–22.)  Nationwide's emphasis on training varied throughout the applicable time period, but it always remained, at best, a secondary responsibility.

The courts' analyses of training, or lack thereof, in the related investigator cases support a finding that training was, at best, a secondary function for investigators that did not rise to the level of discretion necessary under the test.  For example, the investigators in Fenton conducted missed opportunity reviews and fraud awareness training.  663 F. Supp. 2d at 723.   Other than note that the missed opportunity reviews only accounted for 5% of the investigators' overall performance rating, the court in Fenton did not meaningfully consider training in the primary duty analysis.  This Court should likewise consider training, at best, as a secondary duty and therefore not relevant to the primary duty analysis.

### B)        Un-required Tasks are Not Primary Duties.

It is not enough that Plaintiffs admitted to expressing rare opinions in the performance of their "job," but rather these activities must be "contemplate[ed] . . . as part of [their] primary duty."  Schaefer, 358 F.3d at 405–06.  This proposition is clearly expressed in Reich v. Gateway Press, Inc., which addressed whether reporters' primary duty included "invention, imagination,

19

or talent," under the professional exemption.  13 F.3d 685, 699–700 (3d Cir. 1994).  The Third Circuit found that the reporters' "bread and butter work" was to "collect information" and combine it "into a single source," which "does not require any special imagination or skill" or talent.  Id. at 700.  The circuit court, therefore, concluded that, "although occasionally the reporters may have done creative work, their day-to-day duties were routine fact gathering work that could be done with 'general manual or intellectual ability and training.'"  Id. (citation omitted).  As made clear by the Third Circuit, any old "job" task does not automatically rise to the level of "primary;" rather, it must be "principal, main, major or most important."  29 C.F.R. § 541.700(a).

Nonetheless, Nationwide argues: "The Plaintiffs' admissions at trial [that they gave opinions on 'rare occasions'] are enough to establish that their job included the exercise of discretion and independent judgment."[10]  (Def.'s Post-Trial Br. 32, 34.) Nationwide cites Robinson-Smith, 590 F.3d 886, for this proposition, but Robinson-Smith is materially distinguishable.  The parties in Robinson-Smith agreed that plaintiff-claims adjusters exercised "some" discretion in assessing, negotiating, and settlement claims, but disputed whether there was enough discretion to qualify as "primary."  Id. at 893–94.  There was no dispute that the adjusters were required to partake, as part of their job duties, in these activities at issue; the only question was how often and whether this was enough.  See id.

Opinions provided by Nationwide's Special Investigators, on the other hand, were not only a *rare occasion*,[11] but more importantly, they were *not required*.  Nationwide failed to show

---

[10] Nationwide grossly misquotes Plaintiff Foster's testimony, claiming he "acknowledg[ed] that [he could have verbally communicated an opinion to a claims adjuster] as high as 50% or 100% of the time.  (Def.'s Post-Trial Br. 33.)  Nationwide correctly quotes Plaintiff Foster on page 20 of its brief, where he estimates that he gave his opinion about whether a claim was fraudulent five percent of the time, but could be 1% or even 0.5% of the time.  (Id. at 20.)
[11] See also § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.").

that Plaintiffs' primary duty—that is, the tasks they were charged with completing—included these opinions and recommendations. The evidence actually shows that Nationwide designed the investigator function to avoid this practice all together to protect the company from bad-faith litigation and licensure violations. Because of this, Nationwide cannot now point to rare off-the-grid examples to establish a _primary_ duty. And, as Plaintiffs established in their initial Closing Trial Memorandum (ECF No. 195 at 34–35), Special Investigators were _not evaluated_ on their opinions or recommendations, (id. at 29–30), _not trained or directed_ to provide opinions or recommendations, (id. at 25–28), _not disciplined_ for failing to provide opinions or recommendations, (id. at 2), and Nationwide's documents are wholly void of any reference to Special Investigators providing opinions on fraud. (Id. at 31–33.)

### 1) Nationwide's Discrete Examples of Special Investigators Providing "Opinions" on Whether Fraud Occurred are Unavailing and Do Not Establish Their Primary Duty.

Striving to meet its burden that these opinions were part of Special Investigators' primary duty, Nationwide provides unpersuasive, discrete examples of Plaintiffs rendering opinions and recommendations on fraud.[12] Nationwide discusses at length one of the thousands of investigations that Plaintiff Foster conducted during his employment at Nationwide, characterizing it as a "good example[] of how a special investigation plays out inside the life of a claim to help the claims adjuster make a coverage decision." (Def.'s Post-Trial Br. 14.) As discussed below, it is not.

Nationwide cites Plaintiff Foster's investigation of a wage loss claim following an automobile accident. (Tr. vol. 3, 206:22–25.) Nationwide asserts that Plaintiff Foster, "without

---

[12] Despite focusing on "off-the-record" opinions about fraud in file conferences during its case-in-chief at trial, Nationwide appears to step back from its unconvincing argument by only referencing file conferences in a footnote, claiming that "file conferences are often the venue at which Special Investigators give their view of what really happened on the claim they investigated." (Def.'s Post-Trial Br. 33 n.24.) As explained in Plaintiffs' closing trial memorandum, Nationwide's "off-the-record" theory fails. (Pls.' Closing Mem. 36.)

verification one way or another from the signers of the [wage] receipts[13]. . . still told the claimant that 'it would be highly unlikely that we would be making a payment based upon the receipts provided as they did not appear to be valid and that my recommendation was going to be a denial of any moneys reflected in the receipts." (Def.'s Post-Trial Br. 15.) Nationwide's reliance on this excerpt of Plaintiff Foster's log notes is unavailing for two reasons. First, Plaintiff Foster clarified during his testimony that making the statement about payment to the claimant was only to encourage the otherwise difficult individual to cooperate with his investigation, and that he never actually made any recommendation to the adjuster to deny the claim. (Tr. vol. 3, 208:9–25.) Second, and perhaps more important, Plaintiff Foster's reference to denial of a payment was contrary to Nationwide's strict directives to Special Investigators that they may not communicate with a policyholder or claimant about claims disposition. Plaintiff Short, for example, was harshly disciplined for sending a communication regarding a claim denial, resulting in a "One and Done," meaning if he had another disciplinary incident of that magnitude, he would be fired. (Tr. vol. 2, 36:9–15.) Such a prohibited practice does not advance Nationwide's case.

Nationwide also clings to the fact that Plaintiff Foster called the receipts "bogus" in his log notes. (Def.'s Post-Trial Br. 14.) Plaintiff Foster acknowledged that the phrase "bogus" was inappropriate, and he should have instead said "not verifiable." (Tr. vol. 3, 219:24-220:1.) Nationwide downplays Plaintiff Foster's qualification by accusing him of playing the semantics game. (Def.'s Post-Trial Br. 1.) But, Plaintiff Foster was absolutely correct according to Nationwide's upper management—Mr. Phifer—who testified that he "[doesn't] want you to say, I believe the policyholder is lying. That's the kind of opinion that we are not wanting to hear because it's not based on the fact . . . Now you are able to say, the information that the

---

[13] The testimony reveals that Plaintiff Foster attempted to verify the receipts but had not been able to. (Tr. vol. 4, 128:21–24.)

policyholder provided . . . does not support or has not been validated, or I can't verify it."[14] (Tr. vol. 1, 71:19–25.) "Not verifiable," on the other hand, objectively conveys that Plaintiff Foster was unable to find any evidence consistent with the receipts. It is undisputed that Plaintiff Foster's opinion that the receipts were "bogus," should not have been in his log notes, proving to be the exception, and not the norm.[15]

### 2) A Once-in-a-Career Investigation Does Not Exemplify Special Investigators' Primary Duty.

Consistent with Nationwide's strategy throughout its post-trial brief to rely on extraordinary circumstances as evidence of Special Investigators' primary duty, Nationwide details a once-in-a-career investigation conducted by Plaintiff Jacobs. (Def.'s Post-Trial Br. 9– 10.) Plaintiff Jacobs' "Ferrari" claim started off as an ordinary investigation; the referral came to SIU because the policyholder wrecked an expensive car. (Tr. vol. 3, 91:21–92:7.) As he continued his investigation, he realized that he had ultimately stumbled into a staging accident scheme. (Id. at 94:1–16.) Based on his knowledge and skill acquired from 25 years in law enforcement, Plaintiff Jacobs reached out to his former employer, the Maryland State Police. (Id. at 94:19–20; Tr. vol. 3, 40:4–5.) He also went above and beyond his job as a Special Investigator, writing the warrant in that case—a task he completed many times as a police investigator. (Tr. vol. 3, 94:19–21.) The investigation even resulted in him receiving an investigator of the year nomination. (Id. at 91:17–19.)

---

[14] Plaintiff Foster was not disciplined for including the opinion "bogus" in his log notes, likely because his manager did not see the phrase in his file. (Tr. vol. 4, 130:14–18.)

[15] Nationwide references a few more of these exceptional instances without providing the full context of the testimony. For example, Nationwide cites another of Plaintiff Foster's investigations, where he stated in the log notes that he did not believe the jewelry store switched out a diamond for the cubic zirconium. (Def.'s Post-Trial Br. 16–17.) Consistent with Mr. Phifer's testimony concerning opinions in the log notes, Plaintiff Foster acknowledged that he should not have provided that opinion. (Tr. vol. 3, 204:22–25.) Nationwide also references one (of hundreds) of Plaintiff Schmidt's log notes where he stated that there was no indication of "any intentions to defraud the company at this time," but Plaintiff Schmidt also testified that this entry was erroneous because investigators did not determine fraud. (Tr. vol. 7, 100:3–20.)

Plaintiff Jacobs' experience on this file was truly unusual. It was made possible through a combination of sheer luck, i.e., stumbling onto an illegal scheme, and by his extensive experience as a police detective. This particular investigation, while impressive, is certainly not the norm and fails to satisfy Nationwide's burden. See Gusdonovich, 705 F. Supp. at 263 ("[I]nvestigators were merely applying their knowledge and skill in determining what procedure to follow, which . . . is not the exercise of discretion and independent judgment contemplated by the regulation.").[16]

### C) Remote Supervision Does Not Make Special Investigators Exempt.

Nationwide makes much of the fact that Special Investigators worked from home and were not subject to "over the shoulder" supervision. While "freedom from direct supervision" is contemplated by the regulations, 29 C.F.R. § 541.700(a), "it is not wholly determinative because the critical issue is the nature of the work." Clark, 789 F.2d at 288. The defendant in Gusdonovich, and the employer requesting the 2005 Opinion Letter, both similarly argued that investigators were not subject to "immediate supervision," and the court and DOL respectively found the investigators to be nonexempt. 705 F. Supp. at 264; 2005 Opinion Letter, at *6.

Regardless, Nationwide overemphasizes Special Investigators' autonomy. The record shows that managers monitored investigators' activities through the claims logs, (see, e.g., Pls.' Ex. 814 at 3–4), and through meetings, telephone calls, and emails. (See, e.g., Tr. vol. 2, 254:23–255:5 (L. Savage); Pls. Ex. 624.) Investigators were further supervised through

---

[16] In a footnote, Nationwide mischaracterizes Plaintiff Jacobs's testimony on another file, claiming he was impeached, (Def.'s Post-Trial Br. 15 n.14), but he was not. At his deposition Plaintiff Jacobs responded that he thought the policyholder was being truthful based on his examination of the vehicle, but elaborated on his answer by stating that the physical evidence (the vehicle examination) was consistent with the policyholder's statement. (Tr. vol. 3, 113:24–114:19.) At trial, when asked a similar question, Plaintiff Jacobs responded that the facts spoke for themselves (because the physical evidence was consistent with the policyholder's statement). (Id. 110:17–111:18.) These statements are not contradictory and do not qualify as impeachment.

Nationwide's multiple auditing processes, FRQs,[17] and the claims adjusters' customer satisfaction surveys.  (See, e.g., Tr. vol. 2, 105:18–20 (T. Short); Pls.' Ex. 516; Pls.' Ex. 800 at 4 (showing Plaintiff Savage had 21 audits conducted on his files in 2006).)  Thus, the level of supervision does not assist Nationwide in meeting its burden.

### D) The Salary Comparison Between Special Investigators and Material Damage Appraisers Actually Supports a Finding that Plaintiffs are Nonexempt.

Nationwide belabors its comparison between the compensation afforded to material damage appraisers and Special Investigators.  Plaintiffs have already argued that the striking similarities between the two positions actually supports Plaintiffs' position that Special Investigators should be likewise classified as nonexempt, (Pls.' Closing Mem. 49–50), but Nationwide's salary comparisons are also unpersuasive for these additional reasons:

First, Nationwide asserts that the "Special Investigators here are compensated, on average, $30,000.00 more annually than nonexempt Material Damage Appraisers . . . ."  (Def.'s Post-Trial Br. 31.)  This statement is misleading and inaccurate.  Nationwide presented at trial the _market_ average for these positions; in other words, the price that insurance companies have to offer to applicants to attract and obtain new talent.  (Tr. vol. 5, 77:1–7 (L. Brady) ("And it represents what that specific job goes for in the market."); Tr. vol. 7, 224:20–225:2, 232:2–5 (R. Gandarillas).)  This tells us nothing about "the relationship between [_Nationwide's_] employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700.  There is nothing on the record regarding the actual salaries of employed material damage appraisers as compared to special investigators.

---

[17] Nationwide notably cites to only three iterations of the FRQs in its post-trial brief:  the 2004 version, which is the earliest applicable FRQ during the statutory period; the 2010 version, which applies to the tail end of the statutory period; and the "revised 2011 FRQs," which is actually the 2012 FRQ not applicable at the time of trial.  (Def.'s Post-Trial Br. 18, 24, 42.)  Nationwide's Brief is entirely void of the most relevant and applicable FRQs during the statutory period.

Nationwide's witnesses were also unaware of what precisely drives these market rates. Ms. Brady was unsure whether the averages included exempt, as well as nonexempt employees. (Tr. vol. 5, 114:1–6 (L. Brady).)  If they do, then the comparison is further meaningless as it would no longer be between a pure exempt versus a pure nonexempt position.  It also bears noting that these rates represent salaries at the initiation of an employment relationship.  One reasonable explanation for the discrepancy, unrelated to exemption status, may be that investigators are often retired police officers—seasoned in their career, and therefore may demand a higher starting salary in the marketplace than an entry-level appraiser would.  The record is unclear, but what is clear is that Plaintiff Schmidt did not get a raise when he moved from the claims department to SIU.  (Tr. vol. 7, 72:22–24.)

Second, an elementary contrast between annual earnings is extremely disingenuous because the salaries of Special Investigators and material damage appraisers are much more comparable when evaluated on a more equal footing.  As Plaintiffs testified, they worked long hours—often times in excess of sixty per week.  (Pls.' Closing Mem. Appx.)  They worked hard for their salaries.  Thus, their regular hourly rate, using a sixty hour workweek, breaks down to just over $24.00 per hour (median market value divided by 52 weeks divided by 60 hours).[18] Assuming material damage appraisers regularly worked forty hours per week (a safe assumption since Nationwide must pay them an overtime premium for all hours worked over forty), then their hourly rate would be $19.86.  The median market values for the two positions are much more comparable at the hourly level, and these rates move closer and closer together with every additional hour worked by the material damage appraisers (because their hourly rate increases as they work overtime).  Assuming a material damage appraiser, who makes the median market

---

[18] This hypothetical is illustrative only and assumes that Special Investigators' salary compensates them for all hours worked.

value, worked sixty hours per week like Plaintiffs in a given year, then she would earn an annual salary of **$72,275.00** ($19.86 multiplied by 40 hours plus the overtime rate of $29.78 multiplied by the 20 overtime hours), which is nearly identical to the Special Investigators' $75,000.00 median.

For these many reasons, the comparison between the two positions hurts Nationwide more than it helps with the primary-duty analysis.

### E)    Every Work Task Is Not Swept Into the Primary Duty by the "Directly and Closely Related" Regulation.

Lastly, Nationwide attempts to bundle "finding the truth" with Special Investigators' other, nonexempt investigatory duties using the "directly and closely related" provision of the regulations.  (Def.'s Post-Trial Br. 24 n.22); see also 29 C.F.R. § 541.703(a).  This provision, however, was not intended to allow employers to link nonexempt duties with supposedly exempt duties to establish an exempt _primary_ duty.  Rather, this provision stands for the proposition that large quantities of nonexempt work will not hinder an already-established exempt status so long as that nonexempt work is "directly and closely related" to the exempt work.  See Horrocks v. Daggett County, 2:05-CV-00238, 2006 WL 2598331, at *8 (D. Utah Sept. 11, 2006) ("The Federal Regulations state that performing some manual work does not remove an otherwise exempt employee from 'white-collar' status if it such work directly and closely relates to her work requiring the exercise of discretion and independent judgment." (citation omitted)).

In other words, the "directly and closely related" provision protects an already-established exemption status from eroding when the employee conducts work that is arguably beneath her stature.  It does not, as Nationwide contends, allow an employer to lump nonexempt work in with exempt work for the purpose of establishing the exemption in the first place. Nationwide must independently show that Special Investigators primary duty included the

exercise of discretion and independent judgment as to matters of significance, which it has failed to do.

## VII) THE COURT SHOULD FIND IN FAVOR OF PLAINTIFFS AS TO THE REMAINING ISSUES.

Nationwide fails to provide any compelling reasons why the Court should not find for Plaintiffs on the remaining issues—liquidated damages, willfulness, fluctuating workweek, Plaintiffs' state law claims, and hours worked.

First, Nationwide cannot meet its substantial burden that it acted in good faith, thus allowing the customary double damages award if Plaintiffs prevail on liability. Nationwide appears to rely on attorney advice from in-house counsel Bonnie O'Neil in attempting to meet its burden, but fails to provide *any* evidence about what her advice entailed or on what it was based. Rather, Nationwide only established that Ms. O'Neil attended the relevant meeting, but did not offer evidence that she even spoke. (See e.g., Tr. vol. 7, 223:13–17 (R. Gandarillas) ("Q. Did Ms. O'Neil express any concerns or reservations from a legal perspective during this meeting relative to the application of the administrative exemption to special investigators? A. I don't recall any, that she objected, or anyone objecting. I think we were all in consensus.").)

In support of its unconvincing reliance on attorney advice, Nationwide cites Featsent v. City of Youngstown, claiming an attorney's "silence" regarding whether employees are appropriately classified establishes its good faith burden. (Def.'s Post-Trial Br. 43 (citing Featsent v. City of Youngstown, 70 F.3d 900, 906–07 (6th Cir. 1995).) The district court in Featsent, however, recognized that any liquidated damages award would come from taxpayer funds, which served as a motivating factor for the district court to reduce (and the Sixth Circuit to affirm) liquidated damages.[19] Id. at 902. Featsent is inapposite, and this Court should not

---

[19] It is unclear by how much the district court reduced the liquidated damages award, as the opinion only refers to

deem attorneys' silence and mere presence sufficient to establish reliance on legal advice.

What the record does reveal is that Nationwide conducted a superficial inquiry into whether Special Investigators were properly classified as exempt, and classified a similar position with actual decision-making authority as non-exempt.  These facts prevent Nationwide from meeting its burden.[20]  (See Pls.' Closing Mem. 45–50.) And the same evidence establishes that Nationwide recklessly disregarded the FLSA's requirements on the classification of special investigators.  (Id.)

Second, Nationwide's arguments about whether Plaintiffs are administratively exempt under federal law equally fail under California law.  Nationwide, for example, uses the same elusive "find the truth" phrase to try to meet its burden, failing to put forth evidence that Plaintiffs Foster's and Edwards' primary duty was to give opinions on fraud.  Rather, Nationwide cites to testimony where its counsel asks whether the *purpose* of the investigation is to resolve a suspicion one way or another, instead of whether Plaintiffs actually provide *opinions* about whether the claim is legitimate or not.  (Def.'s Post-Trial Br. 46–47.)  Nationwide also provides little to no analysis on Plaintiffs' California meal and rest, unfair business practices, itemized wage statements, and waiting time claims.

Third, with regard to Nationwide's fluctuating workweek defense, the issue left for the Court is legal in nature.  Plaintiffs urge the Court to follow the well-reasoned Perkins, Desmond and Russell cases cited in Plaintiffs' Closing Trial Memorandum.  (See Pls.' Closing Mem. 50.)

Lastly, Nationwide claims Plaintiffs provide "little specific evidence" to justify their 55–

---

the amount awarded for liquidated damages as $2,500 for the plaintiff.  Featsent, 70 F.3d at 902.

[20] Nationwide also cites to the distinguishable case Hoge v. Honda of Am. Mfg., Inc., 2:00-CV-995, 2002 WL 1584274 (S.D. Ohio May 3, 2002) (J. Sargus).  In Hoge, which deals with the FMLA, not the FLSA, the Court found that the defendant conducted "quite thorough review" before engaging in the illegal activity and that before the Court's opinion, the issue central to the lawsuit was "an open issue."  Nationwide, on the other hand, conducted a cursory review regarding classification, while ignoring relevant legal authority and offering no evidence regarding the advice of counsel.

60 hours per workweek estimate—notwithstanding documents produced by Nationwide corroborating this estimate. (See Id. at 58.) Because it did not track Plaintiffs' work hours, the burden is on Nationwide to present evidence to refute Plaintiffs' good-faith estimates. Herman v. Palo Grp. Foster Home, Inc., 183 F.3d 468, 472 (6th Cir. 1999) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88 (1946)). Nationwide failed to present any evidence contrary to Plaintiffs' estimates.[21]

## CONCLUSION

After seven days of testimony at trial, Nationwide failed to prove that its Special Investigators are exempt under the FLSA—a remedial statute that the Sixth Circuit construes narrowly against employers. Consistent with the DOL and courts analyzing jobs with strikingly similar duties, the Court should enter judgment in Plaintiffs' favor.


Dated: October 19, 2011                     Respectfully submitted,

                                            s/Matthew H. Morgan
                                            **NICHOLS KASTER, PLLP**
                                            Paul J. Lukas, MN State Bar No. 22084X*
                                            lukas@nka.com
                                            Matthew H. Morgan, MN State Bar No. 304657*
                                            morgan@nka.com
                                            Reena I. Desai, MN State Bar No. 0388311*
                                            rdesai@nka.com
                                            Rebekah L. Bailey, MN State Bar No. 389599*
                                            bailey@nka.com
                                            4600 IDS Center
                                            80 S. 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: 612-256-3200
                                            Facsimile: 612-215-6870
                                            *Admitted pro hac vice

                                            **FREKING & BETZ, LLC**
                                            Randolph H. Freking

---

[21] Nationwide mischaracterizes Ms. Cobb's testimony, claiming she testified she could perform her job as a Special Investigator while only "rarely" working over 40 hours. The question posed to Ms. Cobb, however, was whether she "had the occasion to work more than 40 hours in a workweek," and she answered "yes." (Tr. vol. 6, 120:8–10.) There is no testimony about how often Ms. Cobb worked only 40 hours in a workweek.

randy@frekingandbetz.com
525 Vine Street, Sixth Floor
Cincinnati, OH  45202
Telephone: 513-721-1975
Facsimile: 513-651-2570

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I **HEREBY CERTIFY** that a true and correct copy of the foregoing document has been filed with the Clerk of the Court on October 19, 2011 by using the CM/ECF system, and parties may access the document through the electronic filing system.

s/Matthew H. Morgan<br>
Matthew H. Morgan