# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**FRANK FOSTER, et al.,**

        **Plaintiffs,**

                                  **CASE NO. 2:08-CV-020**
                                  **JUDGE EDMUND A. SARGUS, JR.**
**NATIONWIDE MUTUAL**              **MAGISTRATE JUDGE E. A. PRESTON DEAVERS**
**INSURANCE COMPANY,**

        **Defendant.**

## OPINION AND ORDER

Following trial to the Court, this matter is now ripe for decision. For the reasons that follow, the Court finds in favor of Defendant.

### I.

### A.

Plaintiffs, ninety-one current and former special investigators for Defendant, Nationwide Mutual Insurance Company ("Nationwide"), bring the instant collective action with claims for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA") and the New York and California analogues of the FLSA. Plaintiffs claim that Nationwide improperly classified them as exempt from the FLSA's requirement that employers subject to the Act pay overtime to employees for hours worked in excess of forty in a given workweek. The FLSA's overtime requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). At issue in this case is whether the job duties of Nationwide's special investigators ("SIs" (plural), "SI" (singular)) satisfy the requirements of the administrative exemption.

Pursuant to regulations issued by the Department of Labor ("DOL"), the test for whether an employee is covered by the administrative exemption is comprised of three elements. First, the employee must be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . . ." 29 C.F.R. § 541.200(a)(1). Second, the employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." *Id.* § 541.200(a)(2). Third, the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a)(3). It is an employer's burden to establish that an employee is exempt from the FLSA's overtime requirements. *See Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004). To do so, the employer must establish each of the elements of the exemption by a preponderance of the evidence. *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007). Moreover, the exemption must be narrowly construed against the employer. *Martin*, 381 F.3d at 578.

Employees wrongfully denied compensation for overtime hours worked are entitled to damages equal to the amount of overtime compensation they would have been paid had they been properly classified plus an equal additional amount of liquidated damages. *See* 29 U.S.C. § 216(b). However, in actions where an FLSA violation has been established, a court may opt to forego an award of liquidated damages if the employer can establish "that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." *Id.* § 260. Finally, damage awards under the FLSA are limited by a two year statute of limitations except in cases where an employer has committed a willful violation of the act. In such cases, the applicable statute of limitations is three years. 29 U.S.C. § 255(a).

2

By Opinion and Order dated March 10, 2010, the Court granted summary judgment in favor of Nationwide as to the first and second elements of the administrative exemption test. However, the Court determined that material issues of fact existed as to the third element of the test. By agreement of the Parties, this matter was tried to the Court between September 14 and 22, 2011. In addition to whether the SIs' duties involve the exercise of discretion and independent judgment with respect to matters of significance, the issues tried included whether Nationwide's purported violation of the FLSA was willful or in bad faith, and the number of weekly hours worked by the testifying Plaintiffs.[1] The Parties have submitted post-trial briefing, and, on October 24, 2011, made final arguments to the Court. Before turning to the evidence presented at trial, the Court first commends Counsel for their vigorous advocacy on behalf of their clients' interests. In the Court's view, this is a close case. Both sides, through counsel, have presented cogent arguments. All of the attorneys in this case have been highly competent, professional and effective advocates.

**B.**

Evidence admitted included the testimony of fifteen witnesses and voluminous exhibits. Plaintiffs called Melvin Phifer, Nationwide's Director of Quality Assurance; individual Plaintiffs Tommy Short, Leroy Savage, William Jacobs, Frank Foster, and Ralph Edwards; Lynne Brady, the head of Nationwide's Special Investigation Unit ("SIU"); Janelle Mikusa, a Nationwide human resources employee formerly with oversight over the SIU; and Lee Herman, another Nationwide Employee who had preceded Lynne Brady as the head of the SIU. Defendants called Dave Bano, Nationwide's Chief Claims Officer; Elizabeth Cobb and Adam Marakovits,

---

[1] The Parties agreed to appoint a special master to make damage determinations for the non-testifying Plaintiffs in the event that Plaintiffs prevailed on the issue of liability.

two SIs who opted not to become class members; Wade Wickre, a director in the SIU; Richard

Gandarillas, Nationwide's Assistant Vice President of Compensation and Consulting; and

Plaintiff Robert Schmidt. Additionally, the Parties have offered the deposition testimony of

Plaintiff Phillip Wamock and portions of the deposition testimony of Plaintiff Jacqueline Rider.

1.

Nationwide is a provider of a wide range of insurance services, including vehicle,

property, commercial, and life insurance products. According to a 2004 version of the SIU's

"Best Practices" document, the SIU "exists to service its corporate partners by providing the

highest quality and expedient investigative, informational and consulting services to detect and

deter fraud and to support other objectives of Nationwide." (Joint Ex. 2 at 1.) The SIU is

divided into five regional subdivisions. Each regional subdivision contains three levels of

employees. At the top is an SIU Director. The SIU Directors supervise groups of SIU

Managers, who in turn supervise the individual SIs. The SIU works primarily with Nationwide's

various claims-adjusting units. Testimony indicates that the claims units generally have a

structure that parallels that of the SIU—with claims adjusters ("CAs" (plural), "CA" (singular))

supervised by Claims Managers, who are themselves supervised by Claims Directors.

SIs' jobs consist in large part of conducting investigations of insurance claims containing

indicators of fraud. These claims are referred to the SIU by the claims units. According to

Bano, approximately one-million claims are filed per year on Nationwide policies. Only about

one percent of the filed claims are referred to the SIU for investigation. The general aspects of

the investigation process are not disputed by the Parties. The Parties do, however, dispute the

degree of autonomy, discretion, and judgment exercised by the SIs in carrying out the various

tasks that comprise a given investigation and the level of significance that should be attributed to

4

the various tasks.

The overarching goal of the investigations carried out by the SIs is to resolve the indicators of fraud in the referred claims to either verify that a claim is legitimate or establish that attempted fraud has likely occurred, thus preventing Nationwide from paying on fraudulent claims. Adding sensitivity and delicacy to the investigations conducted by the SIs is the fact that the investigations are often of Nationwide's own policyholders who are also, in the aggregate, the owners of the company. Further, the denial of claims also exposes the company to liability through bad-faith litigation. It is undisputed that, given state licensing requirements for adjusters and Nationwide's concerns about potential bad-faith litigation, Nationwide precludes SIs from participating in the claims adjusting process or the final decision to pay or deny a claim as these decisions are left to the CAs and their management.

It is also undisputed that a determination of whether fraud likely has occurred or been attempted is of substantial relevance to the claims adjusting process. An issue disputed by the Parties is whether the SIs actually provide opinions and/or recommendations on the question of fraud to the claims unit upon the conclusion of their investigations. Nationwide characterizes the SIs as the "subject matter experts" on fraud who attempt to "discover the truth" and who render opinions on the results of their investigations to Nationwide's claims personnel. Plaintiffs, on the other hand, contend that the SIs are fact gatherers who, prevented by Nationwide's policies from rendering subjective assessments and opinions, merely deliver objective information to the claims unit for use in the adjusting process. According to Plaintiffs, the SIs' fact gathering is a tightly-controlled, mechanical process wherein the SIs discretion is constrained by Nationwide's policies and procedures. In contrast, Nationwide takes the position that discretion and judgment are inherent in the very nature of "fact finding."

5

The SIs conduct their investigations relatively free from the direct supervision of their managers. Upon referral of a claim for investigation, an SI will contact the CA and develop what is referred to as a plan of action for the investigation. The plan of action lists tasks that the SI will complete during the course of the investigation and is based on the nature of the claim's fraud indicators. As the investigation develops, the plan of action may be amended to add or remove tasks. Investigations frequently involve taking statements, interviewing witnesses and claimants, obtaining and reviewing records, and inspecting damaged property. Throughout the course of an investigation, the SIs keep running logs of steps taken and information collected in an electronic log system. During an investigation, the SI and the CA may decide that an examination under oath ("EUO") of the claimant would be beneficial. An EUO is similar to a deposition. Some SIs conduct EUOs in their own investigations, that is, they actually examine the witnesses. Other SIs will make the arrangements for the EUO but will not actually conduct the examination. Somewhat conflicting evidence was offered as to the role SIs play in recommending that EUOs be conducted. There is no dispute that only the CA may ultimately authorize an EUO. The Parties dispute the degree to which SIs expressly convey their conclusions regarding witness credibility and demeanor to the claims units.

Another task that SIs sometimes perform during their fraud investigations is the retention of outside vendors, including accident reconstruction and fire origin experts. While the evidence is essentially undisputed that the claims unit approves the payment of outside vendors, the evidence is conflicting as to the exact role that SIs play in recommending and supervising such vendors. Again, while CAs ultimately must authorize or deny retention of experts, the SIs at least recommend such course.

6

Investigations of claims that are likely to be denied payment because of fraud or for other reasons conclude with a procedure known as a file conference. These conferences are governed by a detailed written policy, and involve personnel from both the claims unit and the SIU. The record is disputed as to the exact role that SIs play in recommending file conferences and at the conferences themselves. Several witnesses testified that file conferences were rare; others indicated that file conferences were standard.

In addition to conducting investigations, SIs also complete several ancillary tasks, some arising during the course of the investigations. For instance, in compliance with the laws of the jurisdictions in which they operate, SIs are required to refer cases of suspected fraud to state law enforcement authorities and the National Insurance Crime Bureau ("NICB"). Additionally, they sometimes identify subrogation opportunities for Nationwide. Aside from their investigations, they on occasion conduct fraud awareness training, and participate in what are known as "missed opportunity" reviews. These are reviews of claims that have not been referred to the SIU to determine if fraud indicators may have been missed.

The SIs' investigations are subject to extensive quality control audits through an auditing tool previously known as accelerated claims excellence ("ACE"), now known as Quality Assurance ("QA"). QA's criteria evolved from year to year during the time period at issue in this lawsuit. As success on audits of their investigations factors into SIs' overall performance evaluations, the SIs invariably attempt to meet the requirements of QA in their investigations. For instance, investigators are graded on whether certain investigatory actions are taken and, if a step is deemed unnecessary, the SI must explain in the claim log why the step was deemed unnecessary. At least partially as a result of QA, SIs make detailed entries into the electronic log

7

system documenting their investigations. If the SIU disagrees with the results of an audit of a particular investigation, a rebuttal process is available to challenge the result. Several witnesses testified that one result of ACE/QA was that the Plaintiff SIs have consistently worked hours in excess of forty per week.

2.

Before discussing the testimony of the individual witnesses, the Court will next describe a series of documents admitted into evidence. These include the SIU Handbook, the SIU "Best Practices" document, the policy establishing procedures for file conferences, and the "File Review Questions," which are a component of the QA/ACE audit process. Plaintiffs generally assert that these documents establish that the SIs were limited to providing only facts and not opinions or recommendations at the conclusion of their investigations.

The mission statement contained in the SIU Handbook states that the "SIU will provide the highest quality, objective and expedient investigative services to validate legitimate claims and deter fraud." (Pls.' Ex. 106 at 3.) One of the listed objectives of the SIU is to "review, investigate and report factual information in a prompt and expedient manner of suspicious claims referred for investigation." (Pls.' Ex. 106 at 3.) Plaintiffs point to the terms "factual" and "objective" in these statements, and emphasize the lack of the term "opinion." However, SI Elizabeth Cobb, testifying on behalf of Nationwide, agreed that reporting factual information in a prompt and expedient manner is a primary duty of the SI position, but also contended that discretion and judgment lie in the SI's role in determining whether something is factual.

Nationwide has drafted a "best practices" document for each of its divisions. In the case of the SIU, the Best Practices Document provides a strategic outline of the investigatory process. Pursuant to the Best Practices Document, "[t]he SIU investigator is responsible for conducting

8

the special investigation." (Pls.' Ex. 54 at 2.) It is a best practice for SIs to "establish evidence and factual information that is the result of a prudent and complete investigation supported by documentation, and the evidence meets the evidentiary legal requirements of the jurisdiction." (Joint Ex. 2 at 3.) The SIs are to report relevant and factual information. (Joint Ex. 2 at 5.) Investigative findings are to be "documented, clear, concise, factual and timely." (Joint Ex. 2 at 5.) With regard to referrals to law enforcement, a later version of the Best Practices Document states that "[r]elevant and factual information will be disseminated to appropriate state agency by the SIU Investigator as required by state laws and regulations." (Pls.' Ex. 54 at 4.) Again, Plaintiffs note that the Best Practices Document does not require SIs to provide opinions or recommendations as to whether fraud has occurred. Nationwide, however, argues that the SIs possess discretion and judgment in determining what is relevant and what is factual.

As its title suggests, the "File Conferencing Procedures" document establishes procedures for file conferences and is referenced in the SIU Handbook and the SIU Best Practices document. Pursuant to the File Conference Procedure, a file conference is required for claims where a denial of the claim is contemplated or where the file includes suspected material misrepresentation or fraud. (Pls.' Ex. 141 at 2.) At a file conference, an SI "provides objective investigative information to the [CA]." (Pls.' Ex. 141 at 2.) Plaintiffs note that the file conference procedures do not require SIs to offer an opinion as to whether fraud occurred. However, pursuant to the procedures, an SI may request a file conference "when it appears there is a substantial possibility a fraudulent activity has taken place." (Pls.' Ex. 141 at 3.) Additionally, the procedures state that the "Claims Department will not seek advice from SIU concerning any decision to settle, deny, compromise or otherwise conclude the claim/loss." (Pls.' Ex. 141 at 4.) An earlier version of the File Conference Procedures required SIU

9

personnel to leave the conference following presentation of their information, but before issues related to the disposition of the claim were discussed. (Pls.' Ex. 752 at 3.)

The "File Review Questions" or "FRQs" are a component of the QA audit process. This document, which went through several iterations during the time period at issue in this case, is designed to add clarity to the audit process. Further, the SIU audit team uses the FRQs in conducting their audits of individual investigations. As stated above, audit scores are a component of the performance evaluations of the SIs. In some years, these scores accounted for up to 55% of an SI's total evaluation. (*See* Def.'s Ex. 215 at 3.)

The FRQs themselves consist of a series of questions, each accompanied by an "intent" and a "training note." These are intended to clarify the questions and provide examples of the questions' applications. According to Plaintiffs, Nationwide's contention that the SIs offer opinions as to whether fraud has occurred is belied by the FRQs, which do not expressly mention opinions or grade the SIs on the opinions they give. Nationwide, however, points to different phrases within the questions that it claims demonstrate judgment and discretion. For instance, Question 27 of a 2004 version of the FRQs asks, "Did the Investigator provide timely and appropriate recommendations and creative suggestions for consideration to the Customer as needed to expedite the resolution of the investigation?" (Pls.' Ex. 91 at 2.) According to Nationwide, this question highlights the sophisticated nature of the relationship between the SIU and claims departments. Plaintiffs note that this question was subsequently removed from later versions of the FRQs, and argue that the contemplated recommendations and suggestions relate solely to the logistics of the investigation.

Plaintiffs cite Question 26 of a 2006 version of the FRQs, which asks, "Were the investigative findings appropriately summarized in the electronic claim system?" (Joint Ex. 6 at

10

10.) The intent for this question states that the summary should be "objective, factual, clear, concise, and accurate." (Joint Ex. 6 at 11.) The training note for this question states that the summary should be "factual and not opinionated." (Joint Ex. 6 at 11.) Plaintiffs note that some versions of this training note say "factual and unbiased." (*See* Joint Ex. 18 at 4.) Question 27 of this same version of the FRQs provides that investigative tasks should be summarized in the claim log within two business days of completion. (*See* Joint Ex. 6 at 10.) The intent for this question states that SIs should summarize "relative and pertinent facts." (Joint Ex. 6 at 11.) Finally, Question 28 asks whether the closing summary was appropriately documented. (Joint Ex. 6 at 10.) The intent for this question states that the summary should contain "pertinent facts that influenced the claim decision." (Joint Ex. 6 at 11.) These questions, intents, and training notes appear in similar form in other iterations of the FRQs.

Plaintiffs also point out that the FRQ question on discussion of the investigation prior to closing does not expressly require opinions and recommendations. Question 30 of a 2007 version of the FRQs asks, "Did the SIU Investigator discuss the final results of the investigation with the referring party prior to closing the file?" (Pls.' Ex. 725 at 9.) Neither the intent nor the training note for this question mentions opinions and recommendations. (*See* Pls.' Ex. 725 at 10.)

Nationwide in turn highlights the intent of Question 7 in a 2009 version of the FRQs, which states that SIs should "not take information gathered on its face value," but should verify "it to be true and factual to the best of their ability." (Joint Ex. 18 at 2.) Nationwide asserts that this sentence supports its contention that the SIs are more than mere fact gatherers, but must use discretion and judgment in making their factual findings.

Both Plaintiffs and Nationwide note Question 29 of the 2009 version, which asks, "Did the SIU Investigator provide claims with the information needed to make an appropriate decision by identifying and resolving all issues throughout the course of the investigation?" (Joint Ex. 18 at 5.) The intent for this question states that the "SIU investigator recognized all issues at the time of the acceptance and as the issues presented themselves throughout the life of the investigation." (Joint Ex. 18 at 5.) Plaintiffs assert that this question only relates to the conveyance of information and does not encompass providing opinions and recommendations. Nationwide, on the other hand, identifies discretion and judgment in terms such as "identify", "resolve, and "recognize."

Finally, Nationwide points to Questions 7 through 9 of a 2010 version of the FRQs, which all incorporate a standard of "relevance." (*See* Def.'s Ex. 403A at 2.) According to Nationwide, the relevance standard suggests discretion and judgment because the SIs themselves must determine what is and is not relevant.

### 3.

The Court will next briefly summarize the testimony of the individual witnesses.

### a.

Plaintiffs called Melvin Phifer, Tommy Short, Leroy Savage, William Jacobs, Frank Foster, Janelle Mikusa, Lynne Brady, Ralph Edwards, and Lee Herman.

Phifer has been Nationwide's Director of Quality Assurance since March 2006. He has never worked as an SI for Nationwide, but has held other positions within the SIU and served as an investigator for another insurance company. Phifer testified that the SI position did not materially change between 2004 and 2010, despite the fact that the documents governing the QA process went through several versions during that time period. According to Phifer, during their

12

investigations, SIs determine what investigative avenues and leads should be followed, what strategies to utilize, and are free from supervision in making these determinations. In his view, the primary duty of the SIs is to convey their factual findings to CAs so that the CA can make the appropriate determination with regard to a claim. It is not a primary duty of the SIs to decide what claims to investigate.

Phifer testified that the term "findings of fact" can be interpreted to include opinions, judgments, and recommendations:

> Q. And when you used the word "finding" when you said they're presenting their findings, what did you mean by "findings"?
>
> A. By "findings," I mean the holistic definition: your judgments, your evaluations, your conclusions, your opinion, even your recommendations. All of that is involved in findings.

(Trial Tr. Vol. I at 194.) However, according to Phifer, SIs are not *required* to give opinions and recommendations:

> Q. I am asking you to say -- I have heard you say a few times that they may give their opinion and recommendation. Are they required to give an opinion and recommendation as part of their job? At any time. Not just in the file conference. Are they required, to perform their job adequately, are they required to give an opinion and recommendation?
>
> A. And the point that I am hesitant on is the requirement language. The special investigator may give an opinion. He may give a recommendation. There are occasions where, again, they may not. I mean it's not that every case they have to write and give an opinion.

(Trial Tr. Vol. I at 56–57.) Further, Phifer testified that SIs are discouraged from actually using the word "fraud" when their findings are presented, because fraud must be determined through a judicial process. Rather, SIs report identified inconsistencies or determinations that given statements are not valid.

Where SIs suspect that fraud has occurred, they are to report the claim to the NICB

13

and/or law enforcement, which can lead to criminal charges being filed. Moreover, according to Phifer, SIs are expected to build relationships with law enforcement agencies. However, Phifer conceded that the SIs are not evaluated based on correct or incorrect referrals to the NICB or law enforcement. With regard to the QA process, Phifer testified that the purpose of the FRQs is to empower the SIs in conducting their investigations rather than to limit their discretion. When confronted with FRQ questions and intents that apparently limit the ability of SIs to provide opinions, Phifer gave as an example a situation where an SI believes that a witness is lying. In Phifer's view, the bald assertion that a witness is lying, without factual support to explain how that conclusion was reached, would be an unacceptable opinion.

Plaintiff Tommy Short is a former SI, who also worked for Nationwide as an SIU Manager and Director. Prior to working in the insurance industry, Short worked in law enforcement. He retired from Nationwide in 2009. While working as an SI at the end of his career with Nationwide, Short was based in Texas. He testified that it was never his primary duty as an SI to provide opinions regarding his investigatory findings. Rather, his job was to provide "[o]nly the facts." (Trial Tr. Vol. II at 21.) According to Short, only facts that could be proved would be entered into the claim log, and it was up to the CA to weigh the facts that were provided by the SI. It was not his job to opine about what the facts meant. During cross-examination, however, Short agreed that it was his job as an SI to "gather the facts about the claim and try to resolve those issues that the adjustor saw and identified as red flags or fraud suspicions." (Trial Tr. Vol. II at 98.) In other words, his role was to determine if the fraud indicators were valid.

Short testified that the "facts" provided to the CAs by the SIs are given in context. An example he gave is the case where an interview reveals discrepancies from other information.

14

The SI would point out the discrepancies to the CA, and then would likely do further investigation to try to explain the discrepancies. A fraud indicator would remain "unresolved" if the SI "found no facts, one way or the other, to prove or disprove." (Trial Tr. Vol. II at 64.) According to Short, upon completion of his investigations, he would communicate the facts he had found. He admitted that he would sometimes express his opinions to CAs he trusted. He was never disciplined for failing to make a recommendation or provide an opinion.

With regard to EUOs, Short described the preparation required for such an examination, which includes gathering together exhibits and developing a strategy, with the goal being to resolve the indicators of fraud. He testified that he required the approval of the claims unit to conduct an EUO, but an EUO could occur based on his recommendation, at his manager's direction, or on request from the CA. EUOs were conducted in only about 10% of investigated casualty claims and in only 1% of material damage claims. EUOs in casualty claims were performed by attorneys.

As to referrals to law enforcement, Short testified that in cases where there was a suspicion of fraud, he would refer the case to the Texas Insurance Department. Cases where claims were denied were referred automatically. Fifteen to twenty percent of the cases he investigated were referred to law enforcement. With regard to outside vendors, Short testified that SIs would suggest that there might be a need to retain one, but that the claims unit had the final authority to approve or deny the recommendation. As an SI, he would choose the vendor.

According to Short, the job of the SI did not change from the 1990s into the 2000s, but the implementation of ACE led to increased requirements as far as tasks to complete for every investigation. The increased requirements added to the time required to perform the job, and Short's performance ratings were affected by ACE. On the other hand, Short testified that he

15

experienced relatively little supervision from his manager while in the field conducting investigations. Finally, Short denied that conducting training was a primary duty of his job, testifying that, during the time period in question, he conducted as few as zero training sessions in a year and as many as eight.

Plaintiff Leroy Savage works as an SI in Ohio and has been employed with Nationwide since 1989. He transferred to Ohio in 1996. According to him, it was never part of his job to provide opinions or recommendations regarding fraud, and he claims to have been instructed by Nationwide management to refrain from doing so. Rather, for updates or during the conclusion of an investigation, he would explain to the CA what he had found, going point by point through the issues identified in the plan of action. However, Savage testified that he does offer an opinion concerning the demeanor of witnesses or how they will present at trial when pressed to do so by the claims department. He is asked to give this type of information 30 to 50% of the time. He is not evaluated on giving opinions or recommendations.

He conceded that the results of his investigations can lead to the denial of a claim, which in turn can lead to bad-faith litigation against Nationwide. Additionally, on cross-examination, he was questioned concerning an investigation he had completed wherein he had noted in the claim log that his investigation indicated that the policy holder was the victim of a "well-planned burglary." (*See* Def.'s Ex. 300 at 4.) He admitted that the coverage decision to pay the claim was based on his investigative conclusions.

Savage does not believe that the SI position has changed over the years. He testified that he still conducts investigations the way he always has despite the fact that job descriptions may have changed. He is subject to little face-to-face supervision from his manager, whom he only sees approximately once every six weeks.

16

Savage testified that he believes that ACE/QA is overly subjective, and that the auditors are not qualified because they lack the experience of the SIs. Partially because of QA, certain investigative tasks such as conducting recorded interviews, taking photographs, checking databases, reviewing police reports, reviewing credit reports, and contacting the insurance agent eventually became mandatory for all investigations in the sense that if they were not done, audit scores and performance evaluations would be affected. ACE, according to Savage, thus increased his total workload as an SI, resulting in more total hours worked.

Savage's description of the preparation necessary for an EUO was similar to Short's, although Savage testified that he personally does not recommend that EUOs be taken. Since the decision is made by the Claims Manager before Savage is in a position to make the recommendation, he defers to the Claims Manager. Only about 5 to 10% of his investigations involve an EUO and he personally has conducted only one or two in the past year.

According to Savage, his recommendations to retain a third-party vendor are usually followed, but, in some instances, the claims unit will hire a vendor without consulting him. Vendors are chosen from lists. Finally, he has conducted only five or six training sessions in his sixteen years as an SI in Ohio.

Plaintiff William Jacobs formerly worked as an SI in Maryland from 2002 to 2008. Jacobs testified that providing opinions regarding his investigatory findings was never part of his job. He claims that early in his tenure as an SI, he had written the phrase "in my opinion" in a claim log and been chastised for doing so by a Claims Manager. He further testified that he was never disciplined for not giving an opinion or recommendation with respect to his factual findings. On cross-examination, Jacobs agreed that his job involved resolving the facts on suspicious claims so that Nationwide would not pay fraudulent claims. However, in some

17

instances, the "facts spoke for themselves." (Trial Tr. Vol. III at 111.) Jacobs was not actively supervised by his manager during investigations.

Jacobs described in detail a scam that he had helped uncover wherein fraudulent claims were filed for automobile accidents that had never actually occurred. The investigation involved an alleged car crash into a wooded area. The claimant was unable to identify where the accident occurred. The claimant represented that he had already had the car repaired, but upon examination, Jacobs could not tell that the car had in fact been repaired or even been involved in an accident. Jacobs attempted to have an outside vendor examine the car, but the claimant refused to present it for inspection. Jacobs eventually worked with law enforcement, going as far as to draft the application for the search warrant used to identify evidence that proved the claimant had been staging accidents.

Jacobs also testified about investigations he was involved with where he made recommendations that the claims be referred to the Maryland Insurance Administration because he was convinced that fraud had occurred. Claims that were denied because of fraud indicators were automatically referred. Jacobs himself sometimes referred claims that had been paid. During the investigation of a particular claim that was referred to law enforcement, Jacobs confronted the claimant with inconsistencies he had discovered and attempted to convince her to withdraw her claim.

With regard to outside vendors, Jacobs testified that he would recommend their retention in situations where his expertise was limited, and that his recommendation was usually followed. Jacobs did not consider training to be a primary duty of his position because he did not do it frequently. With regard to obtaining EUOs, Jacobs also testified that permission of the claims unit was required. On some occasions he would recommend them, but on many occasions the

18

need for an EUO was identified by the CA before Jacobs had begun the investigation.

Lead-Plaintiff Frank Foster worked as an SI in California starting in 2002, having previously worked as an SI in Texas. Prior to his work in the insurance industry, he served as an agent for the Secret Service. He retired from Nationwide in 2010. While employed by Nationwide in California, Foster worked from home, and spent more than 50% of his time conducting investigations. He spoke to his immediate supervisor on the telephone about once a week, and saw him in person only once every few weeks.

Foster testified that it was never part of his job to offer opinions as to whether fraud occurred. He was not evaluated on giving opinions and recommendations. According to him, following his investigations, "I would communicate the facts that I developed in such a manner that the [CA] could make an informed opinion." (Trial Tr. Vol. IV at 32.) In some of his investigations, the facts would point to an obvious conclusion. In others, the facts would actually "make the truth less clear," but, according to Foster, it was not his primary duty to make recommendations or give his opinion regarding the truth. As an example of a situation where an inconsistency would be obvious, Foster described a circumstance wherein one witness identified X number of people riding in a car at the time of an accident, while another witness identified Y number. However, Foster conceded that in certain cases, he would expressly note the fact of an inconsistency in the claim log.

On cross examination, Foster testified that his investigations all involved discovering the truth about what had occurred. Specifically, the "truth about the questionable, suspect or fraudulent activity that [he was] investigating." (Trial Tr. Vol. IV at 17.) He also conceded that the investigatory process involved making "judgments as to where [the facts] were leading me, whether there were other facts to be uncovered." (Trial Tr. Vol. IV at 134.) Foster admitted

19

including information in the claim logs concerning his observations of a witness's demeanor and making judgment calls concerning whether certain parties were or were not culpable. In one instance, he told claimants that he would recommend denial of their claim, which he described as an interview technique, rather than a statement about his actual authority.

Foster also admitted occasionally including opinions in claim logs as to whether fraud had occurred in a given case. According to him, he only rarely recorded such opinions in the claim logs, and tried to avoid orally communicating the opinions to the CA, although he did so on occasion. Foster, however, was somewhat less clear when asked to quantify the percentage of cases in which he expressed an opinion as to whether fraud had occurred, testifying that his estimate of 5% possibly was not correct and tacitly acknowledging that the percentage could be higher.

With regard to the retention of outside vendors, Foster described an investigation involving a car accident where he recommended that a biomechanical reconstruction expert be retained because he was not convinced that the accident in question could have resulted in the claimed injuries. He further testified that it was his responsibility to supervise the expert once retained. However, for certain types of claims, the retention of an expert was something that was automatically done.

Foster testified that it was his decision whether to refer claims to the California Department of Insurance, and acknowledged that such referrals could lead to criminal prosecutions. With regard to EUOs, Foster testified that he did not conduct them during the time period at issue in this case, and that they only occurred in about 3 to 5% of the claims he investigated.

As to the ACE system, Foster agreed with the other Plaintiff-SIs that the implementation

of the audit system increased the workload for the position. Almost every aspect of an investigation was covered by ACE. According to Foster, he would do tasks that he did not think were necessary in an attempt to comply with ACE.

Janelle Mikusa is an employee in Nationwide's Human Resources function. Between 2004 and 2006, she worked as a Senior Human Resources Consultant to the SIU. She participated in and testified primarily concerning Nationwide's 2005 review of the SI position and its determination to classify the SIs as exempt from the FLSA's overtime requirements. She further testified that she was not aware of any changes to the SI position between 2005 and 2009.

Lynne Brady is currently the head of the SIU, and formerly worked in claims and as an SIU Director for Nationwide. According to Brady, SIs make recommendations on whether the claim they are investigating is legitimate, which ultimately leads to the decision to pay or deny the claim. However, the word "fraud" does not appear in the claims logs because SIs cannot actually make the determination that fraud has occurred. Brady testified that she would not discipline an SI for failing to use the terms "opinions" and "recommendations" in their claim logs, stating:

> I wouldn't discipline him for not using that language, no, because I don't care if we call them recommendations, opinions, facts, investigative findings. To me, it's all the same. It's semantics. What it requires is judgment, decision making, discretion, and then coming to a conclusion.

(Trial Tr. Vol. V at 16.) Brady was also questioned regarding a slide presentation concerning the recent revisions to FRQ Question 28 that stated that the revisions are not meant to make the use of the words "opinion" and "recommendation" mandatory. (Pls.' Ex. 892 at 19.) According to her, the change was made to encourage SIs to use those words because the SIs were becoming "skittish" about ever using them in claim logs.

When questioned about whether the phrase "findings of fact," included discretion or judgment, she testified as follows:

> Well, what you have to understand, though, is in order for an SI to make a determination that something is a fact, they do have to use their judgment and come to a conclusion that it's a fact. I would hope they would not be putting something in a file that they haven't made a determination on that it's a fact.

(Trial Tr. Vol. V at 7.)

With regard to law enforcement referrals, Brady testified that referrals are made in cases of suspected fraud, but conceded that all cases investigated by the SIs involve suspicions of fraud. Therefore, any case where the fraud indicators cannot be resolved through investigation would warrant referral. Finally, regarding training, Brady testified that, when she worked in claims, she frequently used the SIU for training of CAs. According to her, the CAs did not have a very good understanding of fraud, whereas the SIs were subject-matter experts.

Ralph Edwards has been employed as an SI in California since 2001. As with other SIs, he worked in law enforcement prior to his employment with Nationwide. According to him, 98% of the claims referred to him have indicators of fraud. He characterized the remaining investigations as "task assignments." He testified that claims are referred to the SIU to resolve suspicions. In other words, the purpose of the investigations is to determine if a claim is legitimate. On cross-examination, he agreed that suspicious claims are referred to the SIU because the SIs are subject matter experts on fraud.

He further testified that he has never provided recommendations or opinions of whether fraud occurred in the claim logs. He also was instructed by his managers not to give an opinion as to whether fraud had occurred. However, Edwards testified that, in a very small number of file conferences per year, he would be asked for and provide a personal opinion on other matters.

22

He further admitted that he will expressly note inconsistencies in statements in the logs. He was never disciplined for not making recommendations or giving opinions at file conferences.

With regard to training, Edwards testified that, in the past year, he had contacted a few CAs, insureds, and agents to discuss fraud trends. Edwards also determines when claims should be referred to the California Department of Insurance, testifying that he does so in situations where the fraud indicators have not been resolved. He takes the referral decision seriously. According to Edwards, his primary duty as an SI has not changed in any significant way since 2003. With regard to EUOs, Edwards testified that between 20 and 30% of his investigations require EUOs but that he has only conducted one personally in the last ten years.

Edwards only sees his manager face-to-face several times per year, and there is no requirement that he report to his manager every day. He completed his investigations with little input from the manager.

Lee Herman, Brady's predecessor as head of the SIU, is currently Nationwide's Assistant Vice President of Centralized Services. The teams that he supervises have responsibility for settling total loss claims throughout the country. According to him, these teams consult regularly with the SIU on suspicious claims because fraud is prevalent in the area of total loss adjusting. These teams contain "embedded" SIs, who consult with claims on whether fraud indicators are present "to make sure that fraud is identified and properly brought to resolution." (Trial Tr. Vol. V at 258.)

Herman testified that the job duties of SIs did not change in any material way during his time as head of the SIU. He was questioned as follows about the lack of written guidance to the SIs concerning their use of opinions:

23

Q. Is there any place in the FRQs, the handbooks, any of the documents, training, anywhere that you are aware of where special investigators are told the difference between a personal opinion and an opinion as to whether fraud was perpetrated or not?

A. I think they are intelligent and well paid. I don't think we need to explain every aspect of the job to them.

Q. And that's one aspect that you don't explain, correct?

A. That's correct.

(Tr. Tr. Vol. VI at 11.) According to Herman, SIs weigh facts, and have discretion in determining what to include in their logs and what to communicate to claims.

**b.**

Nationwide called as witnesses Dave Bano, Elizabeth Cobb, Adam Marakovits, Robert Schmidt, Wade Wickre, and Richard Gandarillas.

Bano is Nationwide's Chief Claims Officer. He testified that fraud is a significant issue to the insurance industry and presents a potentially significant cost to Nationwide and its policyholders. According to him, if fraudulent claims are paid, the premiums that Nationwide charges will rise, and the company will become less competitive within the industry.

He characterized the SIU as "a group that we use to help us reach the truth." (Trial Tr. Vol. VI at 37.) He further testified that SIs are permitted to express opinions as to whether fraud has occurred, noting the distinction between that determination and the determination to pay or deny a claim. Bano also testified that the SIU is viewed as an elite unit within Nationwide because of the cache associated with investigations and because of the relatively high compensation received by SIs. According to Bano, in terms of recruiting individuals to become SIs, Nationwide looks to individuals with twenty or more years experience in law enforcement

for half of its staffing and the other half to individuals working inside Nationwide's various claims organizations.

Bano described the function of the SI as follows:

SIU investigators are paid to exercise their investigative expertise, which is what we pay them for, that they would take that expertise and they would create experience out of it and they apply that experience into making the right decisions around how to investigate, what to investigate, when to investigate. I think you have heard testimony that they operate very, very independently. And ultimately the information that they are able to deliver to the claims organization is key to us being able to get to the truth.

(Trial Tr. Vol. VI 44–45.) According to Bano, since 2004, the main objective of the SI position has not changed.

Elizabeth Cobb has worked as an SI in North Carolina since 2002, and formerly worked as a CA and a Claims Manager. She testified that the SIs are needed to resolve fraud indicators because the CAs lacked the expertise to conduct investigations themselves. She agreed that the job entailed validating legitimate claims, and testified that she communicates to claims her determination as to whether fraud has occurred. She further testified that, in the past, she had provided recommendations to CAs on whether to pay or deny a claim, and admitted that such recommendations were inconsistent with the express provisions of the file conference procedures.

When conducting interviews during investigations, she determines what questions to ask and does not use a preexisting list of questions. According to her, she provides information regarding the demeanor of witnesses to the claims unit. She includes in her claim logs a summary of all significant activities completed by her during an investigation, but not necessarily all of her findings.

Cobb also testified about conducting missed opportunity reviews, indicating that paid

25

claims are sometimes determined to have actually contained fraud indicators. She views these reviews as a type of informal training for the CAs. However, she further testified that her "main job" is conducting investigations, not training CAs. Cobb does not base her investigations around the requirements of ACE. Finally, with regard to outside vendors, Cobb testified that her recommendations were accepted at least 95% of the time.

Adam Marakovits has worked as an SI in Pennsylvania since 2002. He too has prior experience in law enforcement. He works from home and sees his immediate supervisor in person only a few times per year. According to Marakovits, finding the truth is the most important thing that he does as part of his job as an SI. When asked whether he expressed his opinions concerning the results of his investigations, he testified that "I don't know how you can do the job and not provide your opinion. You're the subject matter expert. You're the person that claims is looking to to provide them the information they need to make an informed decision." (Trial Tr. Vol. VI at 199.) However, Marakovits also testified that he only records facts and not opinions in the claim logs out of a concern for bad faith litigation. He also admitted that he was never formally trained to give his opinion.

In his view, an investigation is complete only after he has exhausted all administrative leads that can "either prove or disprove an element of fraud." (Trial Tr. Vol. VI at 188.) However, on occasion, CAs decide to end an investigation and pay a claim before he has finished investigating.

Marakovits testified that "training aspect of the SIs' job" has a significant impact on CAs, and that he conducts trainings "on an as-needed basis." (Trial Tr. Vol. VI at 206–07.) Regarding ACE/QA, Marakovits testified that it does not impact the manner in which he conducts his investigations. Instead, if he conducts a thorough investigation, the ACE

26

requirements will be satisfied. He further testified that he determines the questions to ask and the strategy to employ in conducting interviews and EUOs. According to him, his requests to claims for funds to conduct an EUO are very rarely, if ever, denied. He has conducted hundreds of EUOs.

With regard to the retention of outside experts, Marakovits stated that he recommends that an expert be retained by the claims unit. Finally, Marakovits also testified that he makes the determination as to whether a claim should be referred to Pennsylvania law enforcement. Marakovits estimated that he referred 50 to 75% of his claims to law enforcement.

Plaintiff Robert Schmidt worked as an SI primarily on claims involving losses caused by fire. He worked as a property claims supervisor before transferring to the SIU and did not get a raise upon his transfer. While working as an SI, he was based in Nebraska, but the territory he covered stretched between Oklahoma and Canada. At the time he retired in 2007, Schmidt's manager was located in Phoenix, Arizona, and he only saw the manager face-to-face two or three times per year.

According to Schmidt, his job involved using his own judgment to determine the origin and cause of fires. He agreed during cross examination that investigations conducted by the SIs involve "finding out [ ] [w]as there a fraud or not a fraud." (Trial Tr. Vol. VII at 18.) In other words, the SIs needed to determine whether the claimant "actually intended to get monetary gain through falsifying information." (Trial Tr. Vol. VII at 20.) In one claim log, he wrote "[n]o information was developed which would indicate that our insured has attempted to deceive or defraud the company." (Def.'s Ex. 320 at 11.) Schmidt also testified that his job involved determining the facts of the loss. He further agreed that investigations attempted to validate

27

claims submitted by policy holders. Finding out the truth was the most important part of his job as an SI.

Schmidt testified that his recommendations to retain an outside expert were almost always followed. It was his responsibility to supervise the expert once retained.

He also was responsible for referring claims to law enforcement and testified about a claim he had investigated and referred to law enforcement that had resulted in a criminal prosecution. Finally, Schmidt testified that he needed approval from the claims unit to conduct an EUO, and he recommended EUOs on an as needed basis. He could only remember conducting one EUO during his time as an SI.

Wade Wickre works as an SIU Director for the Southeast United States, and has previously worked both as an SI and an SIU Manager. According to him, the SI position has not changed in any material way since 1999, when he started as an SIU Manager. Wickre testified that his expectation is that if SIs are not having performance problems, they should be free from immediate supervision from their managers. According to Wickre, in his experience as an SI, SIU Manager, and SIU Director, SIs express opinions on the claims they investigate. However, he agreed that the SIs were to provide only "factual information" at the file conferences. (Trial Tr. VII at 172.) He also agreed that there is no formal training advising SIs to report whether a claim was legitimate or fraudulent at the conclusion of their investigations.

Richard Gandarillas is Nationwide's Assistant Vice President of Compensation and Consulting, and testified primarily about Nationwide's decision to classify the SIs as FLSA-exempt. He also testified concerning the differences in market salary between Nationwide's material damage appraisers ("MDAs"), who are classified as non-exempt, and the SIs. Nationwide has assigned MDAs a median market reference value of $41,300. According to

28

Gandarillas, the market reference value is a tool used by Nationwide to measure the market salary rates for a given position. Similar to SIs, MDAs are assigned to claims, investigate and collect information, and eventually make final decisions on whether to pay or deny their claims. Nationwide has classified MDAs as nonexempt employees. Gandarillas testified that the median market reference value for an SI is $75,000, a rate almost double that of the MDAs. According to him, the difference in market reference value arises from expectations regarding the level of skill, knowledge, and expertise of the SI position.

With regard to the classification decision, Gandarillas testified about the review conducted of certain positions, including the SI position, upon the adoption by the DOL of amended regulations implementing the FLSA in 2004. A subsequent review was conducted in November 2005. Upon the conclusion of both reviews, Nationwide management determined that the SIs fell within the administrative exemption.

c.

The testimony of Plaintiffs Jacquelyn Rider and Phillip Wamock was offered by deposition. This testimony is largely cumulative of the live testimony, and the Court will only very briefly summarize the depositions. However, the Court first notes that the Parties have raised various objections to certain designated portions of Rider's deposition testimony. The Court overrules the applicable objections to those portions of her testimony cited below, as described in the footnotes following the citations.

Rider, who is based in Connecticut, was hired by Nationwide in 1988 and was a CA before becoming an SI in 2002. (Rider Dep. 8–9, 15.) She testified that the transition between the two positions was difficult because SIs have no decision-making authority. (*See* Rider Dep. 34.) She further testified that, on one occasion, she was cautioned about including subjective

29

language in her claim logs. (*See* Rider Dep. 258.) She characterized a factual finding as "[s]omething that you didn't know that you found out during the investigation." (Rider Dep. 77.)[2]

According to Rider, approximately 80% of the investigations she does as an SI involve indicators of fraud, and she agreed that her "primary role" in the SIU is to investigate such claims. (Rider Dep. 21.)[3] When summarizing her activities in the claim logs, it is up to her to determine what information is important. (Rider Dep. 39.) She further testified that, at file conferences, her "role would be to give a summary, a synopsis of what my investigation had found." (Rider Dep. 76.)[4]

Rider testified that she has conducted missed opportunity reviews and considered them to be a training opportunity for CAs. (Rider Dep. 125–26.)[5] According to Rider, she does not decide whether an EUO is conducted, but does recommend them. (Rider Dep. 28, 30.) Rider also testified that she needs the approval of both her manager and claims' legal counsel before referring cases to the NICB. (Rider Dep. 92.)[6] Rider also makes recommendations regarding the

---

[2] This testimony is taken from a portion of Rider's deposition offered by Nationwide. Plaintiffs object on the grounds that the evidence is unduly prejudicial. The objection is overruled. This testimony is similar to other testimony admitted at trial in instances where SIs were asked to characterize the nature of their jobs. The prejudicial effect cannot be said to substantially outweigh the probative value of the testimony, especially given that this case was tried to the Court and not a jury.

[3] This testimony is also taken from a portion of Rider's deposition offered by Nationwide. Plaintiffs object on the grounds that Rider's testimony is speculative. This objective is overruled. Rider's estimate of the percentage of claims she investigates that involve fraud indicators is similar to other testimony admitted at trial. Further, her many years working as an SI indicate to the Court that the cited testimony is within her personal knowledge.

[4] See Footnote 2.

[5] This testimony is again offered by Nationwide. Plaintiffs object on the grounds that the testimony is incomplete. This objection is overruled. The Parties agreed to offer Rider's testimony via her deposition, and nothing prevented Plaintiffs from designating further portions of the deposition to provide a more complete picture of the disputed testimony.

[6] Plaintiffs again object to this testimony on the grounds that it is unduly prejudicial. This objection is overruled as the narrow portion of the designated testimony cited by the Court is not prejudicial to Plaintiffs.

retention of outside vendors, but testified that her recommendations are often not followed.
(Rider Dep. 33.)

Wamock worked as an SI for Nationwide from 1998 until 2007, and also had previous
law enforcement experience. (*See* Wamock Dep. 11, 15.) He worked as an SI in California and
then Arkansas. (*See* Wamock Dep. 17.) Wamock testified that the focus of his investigations at
Nationwide was to "find out the truth." (Wamock Dep. 216.) According to him, a "fact" is
"information that you can confirm." (Wamock Dep. 116.) He testified that part of his job
involved separating relevant from irrelevant information. (Wamock Dep. 66.) With regard to
training, Wamock testified that he would provide training to CAs approximately once a month.
(Wamock Dep. 70.)

## II.

### A.

As noted *supra*, the question of whether SIs are exempt from the FLSA's overtime
provisions in this case turns on whether the SIs' primary job duty "includes the exercise of
discretion and independent judgment with respect to matters of significance." 29 C.F.R. §
541.200(a)(3). Accordingly, the Court must first determine the SIs' primary duty.

#### 1.

To qualify for the administrative exemption, "an employee's 'primary duty' must be the
performance of exempt work." *Id.* § 541.700(a). Pursuant to the DOL's regulations, "[t]he term
'primary duty' means the principal, main, major or most important duty that the employee
performs. Determination of an employee's primary duty must be based on all the facts in a
particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*

31

The regulations identify the following non-exclusive factors as relevant to the primary-duty

analysis:

> the relative importance of the exempt duties as compared with other types of
> duties; the amount of time spent performing exempt work; the employee's relative
> freedom from direct supervision; and the relationship between the employee's
> salary and the wages paid to other employees for the kind of nonexempt work
> performed by the employee.

*Id.* The regulations further provide that:

> The amount of time spent performing exempt work can be a useful guide in
> determining whether exempt work is the primary duty of an employee. Thus,
> employees who spend more than 50 percent of their time performing exempt
> work will generally satisfy the primary duty requirement. Time alone, however, is
> not the sole test, and nothing in this section requires that exempt employees spend
> more than 50 percent of their time performing exempt work. Employees who do
> not spend more than 50 percent of their time performing exempt duties may
> nonetheless meet the primary duty requirement if the other factors support such a
> conclusion.

*Id.* § 541.700(b).

"The employee's primary duty is that which is of principal importance to the employer,

rather than collateral tasks which may take up more than fifty percent of his or her time." *Reich*

*v. State of Wyo.*, 993 F.2d 739, 742 (10th Cir. 1993). Further, in determining what an

employee's primary duty is, the Court must look to the duties the employee actually performs as

opposed to the employer's description of the employee's position. *Thomas v. Speedway*

*SuperAmerica, LLC*, 506 F.3d 496, 503 (6th Cir. 2007). "An administrative employee's 'primary

duty' does not consist of one specific task but rather of 'administrative duties' generally."

*Robison-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 895–96 (D.C. Cir. 2010).

Upon considering the testimony and the admitted exhibits, the Court concludes that the

primary duty of Nationwide's SIs is to conduct investigations into suspicious claims with the

purpose or goal of resolving indicators of fraud present in those claims. That conclusion is

32

supported by the great weight of evidence. There is no serious dispute that the SIs spend the

majority, if not an overwhelming majority, of their time carrying out investigations of suspicious

claims. Edwards testified that 98% of the claims he investigated were suspicious. According to

Cobb, her main job was conducting investigations. Rider testified that it was her "primary role"

to investigate fraudulent claims. Further, the testimony is consistent that the investigations

involved resolving fraud indicators in those suspicious claims. Both Short and Jacobs testified

along these lines. According to Foster, all of his investigations involved finding out the truth,

which Marakovits characterized as the most important part of the job. Schmidt characterized the

investigations as efforts to determine the facts of the loss and likewise characterized finding the

truth as the most important part of his job as an SI. From Nationwide's perspective,

investigations into suspicious claims is the most important element of the SIs' jobs because the

investigations help to minimize the payment of fraudulent claims, thus allowing Nationwide to

remain competitive in the insurance industry.

Nationwide's offered formulation of the primary duty is "protecting Nationwide's assets

against the threat of insurance fraud mainly through investigating and resolving the suspicion on

insurance claims with fraud indicators." While this formulation is very similar to the primary

duty determined by the Court, in the Court's view, it is overly broad, and would encompass

every duty performed by the SIs. However, the record does not support the conclusion that

duties such as conducting training, completing missed-opportunity reviews, and performing

investigations involving non-suspicious claims are anything other than ancillary to the

performance of investigations in suspicious claims.

The Court similarly rejects Plaintiffs' offered primary duty, which they phrase as

follows: the SIs' "primary duty was to investigate suspicious claims by gathering and reporting

33

facts." In the Court's view, this formulation is too narrow as it leaves out the resolution of fraud indicators, which the Court concludes is supported by the evidence as being a component of the primary duty.

The primary duty of conducting investigations into suspicious claims with the purpose of resolving the indicators of fraud present in those claims includes several tasks that every SI described during his or her testimony, including resolving the indicators of fraud, gathering information, taking statements, interviewing witnesses, making referrals to law enforcement and the NICB, recommending the retention of outside vendors, supervising outside vendors, and recommending and conducting EUOs.

2.

Having determined that the SIs' primary duty is to conduct investigations into suspicious claims with the purpose and goal of resolving the indicators of fraud present in those claims, the Court next considers whether that duty includes the exercise of discretion and independent judgment with respect to matters of significance. As to this element of the administrative exemption test, DOL's regulations provide the following:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a). Pursuant to the regulations, "all the facts involved in the particular employment situation" should be considered in determining whether an employee exercises discretion and independent judgment. *Id.* § 541.202(b). Factors relevant to the determination include, but are not limited to the following:

whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.*

The regulations make clear that the exercise of discretion and independent judgment can take the form of recommendations, and that employees' job duties can meet the standard even if their decisions or recommendations are subject to some oversight from higher-level managers. *Id.* § 541.202(c). The regulations further state that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). According to the Sixth Circuit, "[t]o determine whether an employee, constrained by guidelines and procedures, actually exercises any discretion or independent judgment, [a court must] consider whether those guidelines and procedures contemplate independent judgment calls or allow for deviations." *Renfro*, 497 F.3d at 577 (citations omitted). The regulations also specify that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." 29 C.F.R. § 541.202(f).

While the Sixth Circuit has apparently not considered a case involving SIs in the insurance industry, the Parties cite various authorities addressing the application of the administration exemption to similar positions. Plaintiffs rely on a 2005 opinion letter ("Opinion Letter"), wherein the deputy administrator of DOL's Wage and Hour Division opined that investigators employed by a company contracted by the Department of Defense to conduct background investigations were not covered by the administrative exemption. *See* Opinion Letter from Dep't of Labor, Wage and Hour Div. (Aug. 19, 2005), 2005 WL 3308592. According to the letter, the investigators were tasked with "providing information critical for [the Defense Security Service] to determine an individual's eligibility for access to classified information and/or assignment to, or retention in, positions with sensitive duties." *Id.* Their duties included interviewing the subject of the investigation and witnesses who possessed relevant information and checking public and criminal records. *Id.* If the investigators determined that the subject was involved in criminal activity or posed a threat to national security, they were to notify the Defense Security Service. *Id.*

The investigators had discretion in scheduling the investigation and in pursuing the various investigatory leads. *Id.* If new leads were discovered during the course of an investigation, the investigators were free to pursue those as well, attempting to avoid "investigative over-kill" while still developing "a complete picture of a subject's life." *Id.* Further, the investigators were tasked with resolving discrepancies that developed during the course of an investigation in accordance with broad guidelines. *Id.* If, during the course of an investigation, the investigator determined that an individual was not credible, the investigator would note that determination in the final report of the investigation. *Id.* While the final report prepared by an investigator was a factor in deciding whether a security clearance would be

36

issued, that decision was ultimately made by the Defense Security Service and not the

investigator. *Id.*

The deputy administrator opined that the investigators would fail to meet both the second

and third elements of the administrative exemption. With regard to the third element, the deputy

administrator stated that:

> we believe that most of the work of the Investigators typically involves the use of
> skills in applying known standards or established techniques, procedures or
> specific standards, as distinguished from work requiring the exercise of discretion
> and independent judgment as required for exemption under 29 C.F.R. § 541.202.
> Even though, as you state, the Investigators are "evaluating alternative courses of
> conduct and acting upon that evaluation without immediate supervision," in our
> view, the Investigators are merely applying their knowledge in following
> prescribed procedures or determining which procedure to follow, or determining
> whether standards are met. This is true even though they may have some leeway
> in reaching a conclusion or performing their work.
> In this regard, planning one's own workload, such as prioritizing the pursuit of
> particular leads, assessing whether the leads provided are in the Investigator's area
> of responsibility, or have provided information that requires further investigation,
> determining which potential witnesses to see and which documents to review, and
> making similar decisions that promote effective and efficient use of that
> individual's own work time in performing assigned investigative activities, do not
> constitute exercising discretion and independent judgment with respect to matters
> of significance.

*Id.* (emphasis in original).

The Opinion Letter was relied upon by the United States District Court for the District of

Minnesota in *Fenton v. Farmers Insurance Exchange*, 663 F. Supp. 2d. 718 (2009). There, the

Court granted summary judgment in favor of plaintiff SIs, ruling that the SIs were not covered

by the administrative exemption. The SIs' job duties were very similar to those of Nationwide's

SIs. As with the present case, Farmers' SIs are assigned claims to investigate that the claims unit

has identified as containing fraud indicators. *Id.* at 722. The SIs are tasked with investigating

the specific fraud indicators that have been identified, and developing investigation plans. *Id.*

During the course of an investigation, an SI may identify other indicators or leads to investigate, but cannot do so without first getting the permission of the claims representative or the SI's supervisor. *Id.*

Farmers' SIs also perform typical investigatory tasks such as retrieving records, conducting interviews, and photographing materials, and are also required to report suspected fraud to appropriate state authorities. *Id.* The SIs may recommend that an expert be retained to evaluate an incident, but the decision to retain an expert is made by the claims representative. *Id.* Claims representatives also decide whether to close an investigation. *Id.* Once the investigation is concluded, Farmers' SIs are required to submit a file containing their research materials, a list of tasks completed during the investigation, or an explanation as to why particular tasks were not completed, and a report of inconsistencies, discrepancies, or inculpating or exculpating findings. *Id.* While the SIs may share impressions regarding the credibility of witnesses during informal conversations, subjective opinions and conclusions are not included in the final, written reports. *Id.* at 722–23. As with Nationwide's SIs, Farmers' SIs do not make recommendations concerning whether claims should be paid. *Id.* at 723. The investigations conducted by Farmers' SIs are also subject to detailed audits, and, as with this case, the audit standards essentially are guidelines for conducting investigations. *Id.* Finally, Farmers' SIs occasionally conduct training sessions and review claims files to look for fraud indicators. *Id.*

In holding that Farmers' SIs did not, as a matter of law, exercise discretion and independent judgment with respect to matters of significance, the Court emphasized the extensive audit standards to which the SIs are subject. *See id.* at 726–27. While, per the DOL's regulations, consultation with employment manuals is not dispositive, the Court found "nothing in the residual discretion available to investigators that is sufficient to justify exemption." *Id.*

38

Of significance to that determination, the Court noted the fact that the SIs' subjective impressions and conclusions are excluded from written reports. *Id.* Thus, the Court concluded that the SIs'

> job duties and [Farmers'] constraints on their discretion are sufficiently aligned with the employment circumstances of (1) the insurance investigators discussed in *Gusdonovich* [*v. Business Information Co.*, 705 F. Supp. 262 (W.D. Pa. 1985)], and (2) the employees performing background investigations and police investigations addressed by the Secretary [in the Opinion Letter], for plaintiffs to be non-exempt from the FLSA's overtime requirements as a matter of law.

*Fenton*, 663 F. Supp. 2d at 726.

In *Gusdonovich*, the United States District Court for the Western District of Pennsylvania held that an insurance investigator whose investigatory duties included "the search of public records, the serving of subpoenas and orders, surveillance, the interrogation of witnesses, and additional duties arising in the course of and subsequent to such investigations" was not subject to the administrative exemption. *Gusdonovich*, 663 F. Supp. at 263. The Court's holding was based in part on its conclusion that the plaintiff performed his job by "merely applying [his] knowledge and skill in determining what procedure to follow." *Id.* at 265.

Finally, Plaintiffs cite *Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896 (D. Minn. 2010), another case from the District of Minnesota, which relies on both *Fenton* and *Gusdonovich*. *Ahle* involved insurance investigator-plaintiffs whose duties included conducting surveillance, undercover investigations, background checks, interviewing witnesses, and obtaining statements. *Id.* at 900. In determining that the investigators did not exercise discretion and independent judgment with respect to matters of significance, the Court identified several aspects of the plaintiffs' positions, including: lack of discretion in deciding when to investigate, where to investigate, and how much time to spend on an investigation; the fact that the defendant

39

did not allow the investigators to make recommendations or opine as to whether fraud had occurred or to recommend further investigation; and the detailed guidelines and manuals the investigators were required to follow in conducting their investigations. *Id.* at 906. One such policy manual stated the following:

> Your job will be to obtain facts that relate to a specific claim. This will include, but is not limited to, taking recorded statements from the person making the claim . . . , witnesses to the specific incident, [and] persons that may have direct knowledge about the incident. . . . Your responsibility is to get the facts of the case by means of questioning or research. At times you will be called upon to obtain needed documentation to include medical records, receipts. . . , employment information, and police reports. You will have to develop comprehensive investigative and communication skills, and you must be able to decide which leads must be followed, and which ones should be reported but need no further effort.

*Id.*

Nationwide relies on the Seventh Circuit's decision in *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008). At issue there was whether MDAs met the requirements for the administrative exemption. While the MDAs do not make coverage or liability determinations, they are "responsible for investigating auto accident damage, making repair or replacement determinations, drafting estimates, and settling claims of up to $12,000 where liability has been established and coverage approved." *Id.* at 868. The MDAs often operate in the field without direct supervision. *Id.* The process for investigating auto accident damage involves physically inspecting the vehicle and possibly interviewing claimants, witnesses, and law enforcement personnel. *Id.* If an MDA suspects fraud during an investigation, he or she will relay such suspicions to a superior. *Id.*

Upon completion of an investigation, MDAs prepare an estimate for the repair of the vehicle, which first requires the determination of whether the vehicle was a total loss. *Id.* In

situations where a structural total loss (*i.e.* a loss where the vehicle is irreparably damaged) is

suspected, the MDA informs a claims representative who makes the final determination of total

loss. *Id.* Where an accident does not involve a total loss, the MDA estimates the costs to repair

the vehicle using a computer system that provides them with a certain degree of flexibility. *Id.*

The MDAs are responsible for explaining the final damage estimate to the insurance claimant.

*Id.* at 869. They refer disgruntled claimants to the responsible claims adjustor, but can settle

claims of up to $12,000 in cases where the claimant is satisfied with the estimate. *Id.*

In determining that the MDAs exercised discretion and independent judgment with

respect to matters of significance, the Seventh Circuit stated:

> When MDAs inspect a vehicle for damage, they must exercise independent
> judgment to verify whether the actual damage is consistent with the claimed
> damage. In doing so, the MDA must evaluate whether the damage is likely
> preexisting, inconsistent with the alleged cause, or otherwise suspicious. The
> MDA must also be on the lookout for fraud when interviewing the claimant and
> any witnesses. These are judgment calls with respect to matters of significance;
> MDAs are using their knowledge and experience to distinguish covered damage
> from fraudulent or preexisting damage. While MDAs do not make final liability
> decisions, their assessment of the damage and its cause bear directly on the
> ultimate coverage determination.

*Id.* at 874. Significantly, the Court's determination was buttressed by its conclusion that "MDAs

like Roe-Midgett make coverage recommendations to their superiors." *Id.*

In *Robison-Smith v. Government Employees Insurance Co.*, 590 F.3d 886 (D.C. Cir.

2010), a case similar to *Roe-Midgett*, the District of Columbia Circuit held that "auto damage

adjustors" employed by GEICO were also covered by the administrative exemption. With

respect to the third element of the exemption, the Court first determined that the auto damage

adjustors exercised discretion through tasks such as negotiating with claimants. *Id.* at 893–94.

As with the MDAs in *Roe-Midgett*, the auto damage adjustors have the authority to settle claims

up to a certain dollar threshold. *See id.* at 895. The Court determined that the ability to financially bind GEICO for amounts of up to $15,000 satisfied the requirement that the exercise of discretion occur with regard to matters of significance. *See id.*

Nationwide also cites *Mullins v. Target Corp.*, No. 09 C 7573, 2011 U.S. Dist. LEXIS 39997 (N.D. Ill. Apr. 13, 2011), wherein the United States District Court for the Northern District of Illinois granted summary judgment to Target on the issue of whether Mullins, who worked as an investigator, was covered by the administrative exemption. Mullins' job duties involved investigating fraud and theft at several of Target's stores in Illinois and Indiana. *Id.* at *6–*7. The Court rejected Mullins' argument that her discretion was severely limited by Target's policies and procedures stating that "[b]y plaintiff's own admissions, she was much more than a fact-gatherer; rather, she compared and evaluated possible courses of conduct and made decisions after considering the possibilities. Her primary duties thus involved the exercise of discretion and independent judgment." *Id.* at *25.

In reaching this conclusion, the Court identified several key aspects of her position. These included that Mullins decided when further investigation was warranted by analyzing data from the stores for which she was responsible; that Mullins decided what types of investigatory tactics to apply; and that she had discretion in conducting interviews. *Id.* at *20–*22. Despite the fact that Target's directives and policies precluded the expression of subjective assessments in written reports, investigators were expected to orally express opinions. *Id.* at *22–*23. While Mullins' activities frequently required approval from her supervisors, and her recommendations were not always followed, per 29 C.F.R. § 541.202(c), an employee may exercise discretion and independent judgment even if his or her decisions are subject to review. *Mullins*, 2011 U.S. Dist. LEXIS 39997 at *23–*25. Finally, the Court held that Mullins exercised discretion and

42

judgment with respect to matters of significance, relying on the Target's interest in preventing fraud and theft and the fact that Mullins' work had on occasion saved the company substantial amounts of money. *See id.* at \*25–\*27.

In examining the record before it, the Court concludes that the SIs' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance in at least two distinct ways. First, the SIs are tasked with resolving indicators of fraud. Second, the SIs have nearly unilateral discretion in referring claims to law enforcement and the NICB.

Turning to the resolution of fraud indicators in the claims investigated by SIs, Plaintiffs argue that Nationwide is attempting to have its cake and eat it too by complying with state laws that prevent unlicensed individuals from adjusting insurance claims and avoiding bad faith litigation, while at the same time asserting that the SIs jobs involve providing recommendations and opinions to management, an activity conceivably encroaching upon that which may only be done by licensed adjusters. Plaintiffs point to the requirements in Nationwide's policy documents that SIs provide only factual information and not opinions in claims logs and in oral discussions to refute Nationwide's position regarding discretion and judgment in the fact-finding process. Plaintiffs emphasize words and phrases in these documents such as "factual and not opinionated" and "objective" as evidence that the SIs exercise no discretion or judgment. However, other language in the documents, and the testimony of the SIs, suggest just the opposite. In the Court's view, terms such as "factual findings," "relevant," "pertinent," and "resolve" connote a degree of discretion and judgment inherent in the investigatory process undertaken by the SIs. In other words, as per *Renfro*, these terms all "contemplate independent judgment calls." *Renfro*, 497 F.3d at 577.

43

Further, nearly all of the testifying SIs characterized their investigations as searches for truth or attempts to determine that the subject claims are either legitimate or not legitimate. For instance, Jacobs testified that it was his job to resolve the facts on suspicious claims. According to Foster, all of his investigations involved finding the truth. Edwards testified that claims are referred to the SIU to resolve suspicions. Cobb testified that the job involves validating legitimate claims. Marakovits testified that finding out the truth is the most important part of the job. Schmidt shared a similar sentiment and further testified that he used his judgment to determine the origin and cause of the fires he investigated. Finally, according to Womack, the goal of his investigations was to find out the truth.

A doctorate in philosophy is not required to realize that "truth" is not an entirely objective concept. Determining truth requires "factual findings," a process that necessarily requires judgment and discretion. Nationwide's SIs use their experience and knowledge of fraud to distinguish the relevant from the irrelevant, fact from untruth, to resolve competing versions of events. Accordingly, the Court concludes that through the resolution of indicators of fraud, the SIs exercise discretion and independent judgment. The Court further concludes that the discretion exercised by the SIs impacts matters of significance. The facts developed by the SIs during their investigations have an undisputed influence on Nationwide's decisions to pay or deny insurance claims. Paying insurance claims is central to Nationwide's business, and payment of fraudulent claims would threaten to make the company less competitive in its industry.

The Court's holding that the SIs exercise discretion and independent judgment with respect to matters of significance is supported by the DOLs regulations, which identify as a factor in determining the administrative exemption "whether the employee investigates and

44

*resolves* matters of significance on behalf of management." 29 C.F.R. § 541.202(b) (emphasis supplied). Further, because of their significant experience and knowledge of insurance fraud, the SIs can also be viewed as providing expert advice and consultation to management. *See id.* As with the MDAs in *Roe-Midgett*, Nationwide's SIs use their experience and knowledge to make judgment calls that in turn have a significant impact on Nationwide's decisions to pay or deny claims. In reaching its conclusion, the Court also notes that the SIs conduct their jobs free from day to day supervision of their managers. While this fact is obviously not dispositive of the issue, the Court is commanded by the DOL's regulations to consider the issue "in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b).

Some of the testifying Plaintiffs noted that, in certain instances, the facts of particular situation "speak for themselves." The Court credits this testimony and agrees that, in the variety of claims investigated by the SIs, some are undoubtedly more simplistic than others. However, this fact does not undermine the Court's conclusion that discretion and independent judgment is inherent in the fact finding element of the SIs' investigations. In this regard, the DOL's regulations only require that the primary duty of administrative employee "include" the exercise of discretion and independent judgment. *See id.* § 541.200(a)(3); *Robison-Smith*, 590 F.3d at 894 ("In any event, engaging in total loss negotiations even 20 times per year satisfies the short test requirement that the adjuster's primary duty "include[ ]" the exercise of discretion and independent judgment."). Accordingly, the fact that the determination of the truth in some cases may require less judgment and discretion than in others is not fatal to Nationwide's establishment of the administrative exemption.

The Court further holds that the SIs' referral of claims to law enforcement and the NICB

45

constitutes the exercise of discretion and judgment with respect to a matter of significance. The testimony was nearly uniform that the SIs decide when referrals should be made without direct supervision from their managers or the claims unit. Referrals are made in cases where fraud indicators are unresolved. The discretion and judgment inherent in the resolution of the fraud indicators thus also attaches to the decision to make a referral. While referrals are automatic in some situations, this fact alone does not remove the referral process from the administrative exemption. Finally, referral to law enforcement of policy holders and claimants is undoubtedly a matter of significance as it involves potentially subjecting these individuals to criminal prosecution.

The Court respectively declines to follow the decisions of the United States District Court for the District of Minnesota in *Ahle* and *Fenton*, which relate to investigator positions that are very similar to those at issue in the present case. With regard to the Opinion Letter, the Supreme Court has held that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotations omitted). However, in *Christensen v. Harris County*, 529 U.S. 576 (2000), a case decided three years after *Auer*, the Supreme Court specifically addressed and clarified the deference that should be afforded agency opinion letters. The Court stated:

> Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference. . . . Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the "power to persuade," *ibid.*

46

*Christensen*, 529 U.S. at 587. Accordingly, the Court treats the Opinion Letter as persuasive rather than mandatory authority.

Moreover, the Court notes several features distinguishing the present case from the Opinion Letter. First, Nationwide's SIs investigate claims arising under many different types of insurance policies. The nature of fraud itself does not lend itself to a simple definition, or a one-size fits all set of parameters. The investigators described in the Opinion Letter, on the other hand, only conduct background investigations that relate to security clearances. Background investigations, even in the area of national security, can be formulaic – records checks, pre-scripted interviews, etc. While there is certainly some variation from background investigation to background investigation, it is unlikely that such investigations involve a broader set of possibilities than the fraud investigations conducted by Nationwide's SIs.

Second, the Court has emphasized the significance of the SIs' authority to refer matters to law enforcement. It is true that the background investigators were required to inform the Department of Defense if they discovered information tending to indicate that the subject of the investigation was involved in criminal activity or posed a threat to national security. While such notification likely involves some discretion and judgment, the level of significance is not as great because a criminal prosecution is further removed than is the case with SIs, who make referrals directly to law enforcement agencies. Finally, the SIs' investigations potentially subject Nationwide to the threat of bad faith litigation and substantial liability, whereas there is no indication that the United States Government is threatened with similar financial liability in the context of background investigations.

3.

47

For the above-stated reasons, the Court holds that Nationwide has satisfied its burden of establishing by a preponderance of the evidence that Plaintiffs are subject to the administrative exemption of the FLSA, and are thus not entitled to overtime compensation.

**B.**

Several Plaintiffs bring claims pursuant to the New York and California analogues of the FLSA. As the parties have stipulated that Nationwide will prevail in establishing that the SIs are exempt from New York's overtime requirements should Nationwide succeed in establishing that Plaintiffs are exempt from the FLSA's overtime requirements (Doc. 195-1, ¶ 4), judgment is awarded in favor of Nationwide on Plaintiffs' New York claims.

**C.**

California's overtime statute is similar to the FLSA in many respects. Pursuant to the California Labor Code:

> [a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.

CAL. LAB. CODE § 510(a). California's Industrial Welfare Commission is given authority to establish exemptions to the above overtime pay requirement for "executive, administrative, and professional employees." *Id.* § 515(a). However, to qualify for an established exemption an employee must be "primarily engaged in the duties that meet the test of the exemption," "customarily and regularly exercise[ ] discretion and independent judgment in performing those duties," and meet certain salary requirements. *Id.* The term "primarily" is defined to mean "more than one-half of the employee's worktime." *Id.* § 515(e).

48

The Industrial Welfare Commission has issued a wage order establishing an administrative exemption. In addition to meeting the three statutory requirements identified above, an employee may qualify for the exemption if the employee's duties involve "performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers" and the employee "performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge," or "executes under only general supervision special assignments and tasks." CAL. CODE REGS. tit. 8, § 11040(1)(A)(2). The wage order incorporates the DOL's FLSA regulations, stating that "[t]he activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215." *Id.* If an employee is subject to the administrative exemption, the employee is not subject to other provisions of the order, such as the requirement that employers provide employees thirty-minute meal periods. *See id.* § 11040(1)(A), (11040)(11).

As with the FLSA, the exemptions to California's overtime statute are to be narrowly construed, with the employer bearing the burden of proving the exemption. *See Ramirez v. Yosemite Water Co.*, 978 P.2d 2, 8 (Cal. 1999). In its Opinion and Order of March 10, 2010, the Court granted summary judgment in Nationwide's favor as to whether the SIs perform non-manual work directly related to Nationwide's general business operations and as to whether the SIs meet the applicable salary requirements. (*See* Doc. 174.) With regard to the remaining elements, the Court first concludes that Nationwide has established that its SIs execute special assignments and tasks under only general supervision. The California Division of Labor

49

Standards Enforcement ("DLSE")'s Enforcement Policies and Interpretations Manual

("Manual") states that employees following within this category often "perform their work away

from the employer's place of business." DIV. OF LABOR STANDARDS ENFORCEMENT,

ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL § 52.3(3) (2002). Here, the record

reflects that the SIs spend substantial amounts of time in the field conducting investigations and

that they operate with little day to day supervision.

The Court next considers whether Nationwide has established that the SIs are "primarily

engaged in the duties that" meet the administrative exemption and "customarily and regularly

exercise[] discretion and independent judgment in performing" those duties. The wage order

specifies that:

> Exempt work shall include, for example, all work that is directly and closely
> related to exempt work and work which is properly viewed as a means for
> carrying out exempt functions. The work actually performed by the employee
> during the course of the workweek must, first and foremost, be examined and the
> amount of time the employee spends on such work, together with the employer's
> realistic expectations and the realistic requirements of the job, shall be considered
> in determining whether the employee satisfies this requirement.

CAL. CODE REGS. tit. 8, § 11040(1)(A)(2)(f).

The Manual further illuminates the applicable concepts, in many cases borrowing

from the DOL's regulations:

> **Right To Exercise Discretion And Independent Judgment.** As provided
> in 29 CFR § 541.207, means "the comparison and evaluation of possible
> courses of conduct and acting or making a decision after the various
> possibilities have been considered."

. . .

> The phrase "customarily and regularly" signifies a frequency which must
> be greater than occasional but which may be less than constant. This
> requirement will be met by the employee who normally and recurrently is
> called upon to exercise and does exercise discretion and independent
> judgment in the day-to-day performance of his or her duties.

. . .

      The most frequent cause of misapplication of the term "discretion and
      independent judgment" is the failure to distinguish discretion and
      independent judgment from the use of skill in various respects. An
      employee who merely applies his or her knowledge in following
      prescribed procedures or determining which procedure to follow, or who
      determines whether specified standards is not exercising discretion and
      independent judgment.

. . .

      The level or importance of the matters with respect to which the employee
      may make decisions is an important criteria. Obviously not all decisions
      independently made by employees constitute the exercise of discretion
      and independent judgment of the level contemplated here. The discretion
      and independent judgment exercised must be real and substantial, that is,
      they must be exercised with respect to matters of consequence. This
      interpretation has also been followed by federal courts in decisions
      involving the application of the federal regulations.

DIV. OF LABOR STANDARDS ENFORCEMENT, ENFORCEMENT POLICIES AND INTERPRETATIONS

MANUAL §§ 52.3.8, 52.3.8.4, 52.3.8.5, 52.3.12 (emphasis supplied).

      For the reasons stated in Part II.A.2 *supra*, the Court concludes that Nationwide has also

met its burden in establishing that the SIs are "primarily engaged in the duties that" meet the

administrative exemption and "customarily and regularly exercised discretion and independent

judgment in performing" those duties. The SIs are primarily engaged in conducting

investigations into suspicious claims with the purpose of resolving indicators of fraud present in

those claims. The SIs spend a majority of their working time conducting these investigations.

During the course of these investigations, they frequently exercise discretion and judgment in

identifying relevant information and resolving the indicators of fraud. In resolving the fraud

indicators and discovering the truth, investigators impact a matter of substantial significance and

consequence to Nationwide—the decision to pay or deny claims.

## III.

Based upon the foregoing, the Court finds in favor of Defendant Nationwide Mutual Insurance Company as to all of Plaintiffs' claims. The Clerk is directed to enter final judgment in favor of Defendant, thereby concluding this case.

**IT IS SO ORDERED.**


_____1-5-2012_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**